## NATIONAL WILDLIFE FEDERATION

### v.

### Robert F. BURFORD, et al., Appellants,

### Mountain States Legal Foundation, et al. (Two Cases).

### No. 86–5239, 86–5240.

United States Court of Appeals, District of Columbia Circuit.

Argued April 27, 1987.

Decided Dec. 11, 1987

As Amended Dec. 15, 1987.

Jacques B. Gelin, Atty., Dept. of Justice, with whom Robert L. Klarquist and David A. Kubichek, Attys., Dept. of Justice, and Gary L. Bohlke, Atty., Dept. of the Interior, Washington, D.C., were on the brief for federal appellants in No. 86–5239 and cross-appellee in No. 86–5240.

Constance E. Brooks, Washington, D.C., with whom Casey Shpall, Denver, Colo., was on the brief for Mountain States Legal Foundation, et al., appellants in No. 86–5240 and cross-appellee in No. 86–5239.

Eldon V.C. Greenberg, with whom Norman L. Dean, Jr., and Kathleen C. Zimmerman, Washington, D.C., were on the brief for National Wildlife Federation, appellee in Nos. 86–5239 and 86–5240.

Before MIKVA and WILLIAMS, Circuit Judges, and WEIGEL,[*] Senior District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion concurring in part and dissenting in part filed by Circuit Judge WILLIAMS.

MIKVA, Circuit Judge:

The National Wildlife Federation (the Federation), a private organization dedicat-

[*] Of the United States District Court for the Northern District of California, sitting by designation pursuant to 28 U.S.C. § 294(d).

ed to conserving the nation's natural resources, brought suit against the Director of the Bureau of Land Management, the Secretary of the Interior, and the Department of the Interior (collectively, the Department), challenging the Department's conduct of its "Land Withdrawal Review Program" (the Program). Pursuant to the Program, the Department lifted protective restrictions pertaining to almost 180 million acres of federal land located in seventeen states. This land is subject to the requirements of the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq.* (1982) (FLPMA or the Act), which establishes comprehensive rules for the management and preservation of federal lands and provides for protection of land in the public domain from private ownership and development.

The Federation alleged, *inter alia,* that in lifting protective restrictions under the Program, the Department improperly ignored statutory provisions which subject release of land from the public reserve to careful procedural protections. The district court issued a preliminary injunction, enjoining the Department from modifying, terminating, or revoking any restriction in effect on January 1, 1981, and enjoining the agency from taking any action inconsistent with such restrictions. Appellants, the Department and Mountain States Legal Foundation (Mountain States), a nonprofit group which represents public land user groups, contest the injunction on several grounds. They principally contend that the Federation lacks standing to challenge the Department's actions, that the injunction impermissibly restricts the rights of absent third parties, and that the Federation is not entitled to the injunction under traditional equity principles. We reject each of appellants' arguments and affirm the district court's issuance of the preliminary injunction.

## I. BACKGROUND

### A. *The Applicable Law*

This action concerns the Department's authority to establish and implement land use planning for millions of acres of feder-

al public lands. This authority precedes the enactment of FLPMA. Up until the mid–20th century, management of the nation's public lands consisted basically of a policy of disposal. Under this policy, the government transferred vast acreages of land from federal ownership to private citizens, states, counties, cities, and companies, for purposes such as homesteading and railroad construction. Beginning in the 1930's, however, the federal government began reorienting its policy away from disposal and toward retention and management. The two relevant mechanisms for implementation of this new policy were classifications and withdrawals. "Classifications" designate public lands for retention and frequently segregate the lands from the operation of various land disposal laws. "Withdrawals" directly remove designated lands from disposal under the general land laws.

Classifications for federal lands were made, for the most part, pursuant to the Classification and Multiple Use Act of 1964 (the C & MU Act), 43 U.S.C. §§ 1411–15, now expired. The C & MU Act directed the Secretary of the Interior to develop criteria to be used in determining which of the public lands administered by the Department should be retained in federal ownership and which lands were suitable for disposal. Most classifications for retention segregated lands from sale and from disposal under the agricultural laws (*e.g.,* homestead, desert land entry, and Indian allotment laws). Some classifications further segregated land from exchange, from location under federal mining laws, or from mineral leasing. Many of the lands were classified for multiple use management. Over the years, pursuant to the C & MU Act, the Department classified almost 180 million acres of publicly managed lands for retention by the federal government.

The first withdrawals were placed on public lands by President Franklin Roosevelt under the Pickett Act, which authorized the President to temporarily withdraw from settlement, location, sale or entry any of the public lands in the United States and to reserve the lands for any

public purpose. *See* 43 U.S.C. §§ 141–143, repealed. A withdrawal withholds land from operation of one or more of the general land and mineral disposal laws, including the 1872 Mining Law, as amended, 30 U.S.C. §§ 22, *et seq.*, the Mineral Leasing Act, 30 U.S.C. §§ 181–226–2, and the Geothermal Steam Act, 30 U.S.C. §§ 1001–1025. The purpose of withdrawals is to limit activities under those laws and to preserve other public values, such as recreation and fish and wildlife. At the time this suit was filed, about 68 million acres of land had been withdrawn pursuant to constitutional and statutory authority.

The creation, modification, and revocation of classifications and withdrawals is now controlled by FLPMA. Enacted in 1976, FLPMA provides the Bureau of Land Management (BLM or the Bureau), the subagency of the Department charged with land management responsibilities, with permanent, comprehensive guidelines for carrying out its mandate. The Act requires land use planning for public lands under BLM's jurisdiction and outlines procedures for the development, maintenance, and revision of land use plans. *See* 43 U.S.C. §§ 1701(a)(2), 1712.

The Act also establishes management criteria. FLPMA states that the federal policy under the Act is that "public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest." *Id.* § 1701(a)(1). The Act stipulates additional policy guidelines for BLM's land use planning. First, Congress directed that "management be on the basis of multiple use and sustained yield unless otherwise specified by law." *Id.* § 1701(a)(7). Second,

> the public lands [must] be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and do-

mestic animals; and that will provide for outdoor recreation and human occupancy and use.

*Id.* § 1701(a)(8). Finally, the Act directs BLM to manage the lands in a manner which recognizes the country's need for natural resources. *Id.* § 1701(a)(12).

FLPMA contains specific provisions governing the disposition of classifications and withdrawals in effect when Congress enacted FLPMA. The savings provision of the Act states that "[a]ll withdrawals, reservations, classifications, and designations in effect as of the date of the approval of this Act shall remain in full force and effect until modified under the provisions of this Act or other applicable law." Pub.L. No. 94–579, 90 Stat. 2743. The Act directs BLM to review all existing classifications and to review the existing withdrawals regarding public lands in the eleven contiguous Western states by 1991. *See* 43 U.S.C. §§ 1701(a)(3), 1714(*l*). Section 202 of the Act requires BLM, subject to this review, to develop land use plans for all public lands "regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses." *Id.* § 1712(a). FLPMA further provides that the Department may modify or terminate any existing classification in a manner consistent with the land use plan developed under FLPMA. *See id.* § 1712(d). Similarly, the Act authorizes the Department to revoke withdrawals, but only in accordance with the Act. *See id.* § 1714(a).

The Department has implemented FLPMA's comprehensive land use planning requirements by regulations. These Departmental regulations specifically define the land use plans required by FLMPA as Resource Management Plans (Plans). *See* 43 C.F.R. § 1601.0–5(k) (1986).

### B. *Implementation of the Land Withdrawal Review Program*

Until 1981, the agency took little action to review existing classifications and withdrawals. In 1981, however, the Department proceeded to review of classifications

and withdrawals with full force. Although classifications and withdrawals are technically subject to the review provisions of different sections of FLPMA, BLM determined that classifications would be systematically reviewed as part of the Bureau's Land Withdrawal Review Program. *See* BLM Organic Act Directive No. 81–11 (June 18, 1981), Joint Appendix (J.A.) at 97–A.

The Bureau's stated objective was to cancel a large portion of the classifications created under the C & MU Act. The Bureau ordered the elimination, in total, of all C & MU classifications that met four stipulated criteria. BLM retained discretion to maintain the few C & MU classifications not meeting the criteria pending review of the existing land use plan or completion of the Plan pursuant to FLPMA. *See id.,* J.A. at 97–B. The agency directed priority attention be paid to termination of classifications that segregate lands from mining and/or mineral leasing. Pursuant to these directives, the Department has reviewed classifications covering 167.7 million acres of public land and has terminated classifications for approximately 160.8 million acres. As a result, substantial public land areas have been opened to many previously restricted activities and uses.

The Department directed those reviewing existing withdrawals to determine whether the original purpose of the withdrawal was still being served and if not, to revoke the restrictions. Pursuant to its review process, the Department has revoked withdrawals covering approximately 20 million acres of public lands. The effect of the revocations is that the previously withdrawn lands are open to the operation of all or part of the public land laws, provided the lands remain in federal ownership and are not subject to some other action that would prevent the application of the public land laws.

## C. *Proceedings in This Case*

The Federation commenced this action on July 15, 1985, alleging that the agency's revocations of protective withdrawals and termination of protective classifications pursuant to the ongoing Program violated various specific provisions of FLPMA, the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321, *et seq.* (NEPA), and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* (APA). Three of the eight counts of the Federation's amended complaint are relevant to this appeal. First, in Count I, the Federation claimed that the Department had violated its duties under FLPMA by failing to prepare Plans in connection with its withdrawal revocations and classification terminations. Second, in Count II, the Federation claimed that the Department had violated FLPMA by revoking withdrawals and terminating classifications in eleven Western states without prior submission of a recommendation to the President or the Congress. Third, in Count VII, the Federation charged that the Department had violated FLPMA by failing to provide any opportunity for public involvement in the Department's land status decisions. In its prayer for relief, the Federation sought, *inter alia,* a declaration that the Department's Program violates applicable law and an order both reinstating all withdrawals, classifications, or other designations in effect on January 1, 1981 and enjoining the Department from taking any action inconsistent with such designations until the Department complied with its statutory obligations.

Simultaneous with the filing of its complaint, the Federation moved for a preliminary injunction, seeking to halt any new revocations or terminations and to enjoin any activities inconsistent with the previous withdrawals and classifications. The Federation did not seek to invalidate existing claims nor did it seek to overturn completed sales or exchanges. The Department opposed the motion, arguing mainly that the Federation had not established the prerequisites for injunctive relief. The agency then moved to dismiss the entire action for failure to join the holders of mining claims and mineral leases as indispensable parties. The Department also moved to dismiss Count II of the complaint for lack of standing. Shortly thereafter, the district court granted Mountain States' motion to intervene. John Seiberling, Chairman of the

House Committee on Public Lands, subsequently moved to intervene for the limited purpose of challenging the Department's failure to submit recommendations for withdrawal revocations to the Congress.

In a memorandum opinion, the district court resolved the three pending motions. *See National Wildlife Federation v. Burford,* 676 F.Supp. 271 (D.D.C. Dec.1985). First, the court granted Representative Seiberling's motion to intervene as a plaintiff in the case, rejecting the Department's contention that the Congressman did not have standing to pursue his claim. Second, the court denied the Department's motion to dismiss. The court ruled that although the holders of mining claims and mineral leases were necessary parties, they were not indispensable parties under Federal Rule of Civil Procedure 19; therefore, the court's lack of personal jurisdiction over these absent third parties did not necessitate dismissal of the complaint. The court further noted that under the "public rights" doctrine, first articulated in *National Licorice Co. v. NLRB,* 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940), joinder was not required. The court also held that the issue of the Foundation's standing to pursue Count II of its complaint had been rendered moot by Representative Seiberling's intervention on an identical claim.

Finally, the district court granted the Federation's motion for a preliminary injunction. The court found that the Federation had shown substantial likelihood of success on Counts I and VII of its complaint. In addition, the court found that, unless enjoined, the Department's actions in lifting protective land restrictions would irreparably injure the Federation's members. Further, the court concluded that the harm to third parties was not so serious as to outweigh the other factors supporting injunction. The court further found that the public interest clearly favored granting the injunction. The court therefore issued a preliminary injunction enjoining the federal defendants as well as persons holding interests in land from taking any further action inconsistent with pre–1981 classifications and withdrawals.

The Department moved for amendment, reconsideration, and clarification of the preliminary injunction. Mountain States also moved for reconsideration of the injunction. In addition, Mountain States asked that the court reconsider its denial of the Department's motion to dismiss for nonjoinder. The Department introduced no new arguments, but Mountain States raised two claims for the first time. Mountain States argued that the Federation lacked standing in that it could prove no injury in fact because the lands at issue were subject to commercial exploitation even before the terminations and revocations under the Program. Mountain States also asserted that the Federation had failed to exhaust its administrative remedies with regard to classification terminations. The district court rejected both arguments and denied the motions to reconsider. The court also declined Mountain States' request to certify the joinder question for appeal under 28 U.S.C. § 1292(b). With regard to the defendants' request to clarify the preliminary injunction, the court modified the order to remove the prohibition on the activities of absent third parties. The injunction thus only directly enjoins the federal defendants. The modification also made clear that post–1981 terminations and revocations were "suspended," not voided. *See National Wildlife Federation v. Burford,* 676 F.Supp. 280 (D.D.C.1986). This appeal followed. The district court has denied defendants' motion for a stay of the preliminary injunction pending appeal.

Mountain States also seeks relief on the issue of nonjoinder by way of a separate Petition for a Writ of Prohibition. *See In re: Mountain States Legal Foundation,* No. 86–5353. We deny that relief in a separate order of even date.

## II. PRELIMINARY ISSUES

Before examining whether the Federation was entitled to a preliminary injunction on its two FLPMA claims under conventional standards of equity, we pause to address several preliminary issues raised by appellants. First, we consider appellants' challenge to the Federation's stand-

ing. Second, we inquire whether the injunction impermissibly impinges on the rights of absent third parties over whom the district court has no personal jurisdiction. We then examine appellants' claims that the Federation is guilty of laches and that it failed to exhaust administrative remedies.

A. *Standing*

It is well settled that an organization may have standing to bring suit on behalf of its members. *See International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock (UAW),* 477 U.S. 274, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228 (1986). In *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), the Supreme Court set out the following three-part test for representational standing: (1) one or more of the organization's members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purposes; and (3) an individual member's participation in the lawsuit is not required. The Department and Mountain States both contest the Federation's ability to meet the first part of the *Hunt* test. Appellants assert that the Federation's individual members would not have standing in their own right, in particular because the Federation has not alleged the requisite injury in fact.

In order to mount its claim against the Department under § 702 of the APA, the Federation must demonstrate that "the challenged action ha[s] caused [its members] injury in fact." *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972). The injury-in-fact analysis under section 702 mirrors the one required by the Constitution. *See Community for Creative Non-Violence v. Pierce,* 814 F.2d 663, 667 (D.C.Cir.1987). The Federation must allege facts demonstrating a definable and discernible injury to its members and an adequate connection between that injury and the members. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412

U.S. 669, 688–89, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). The personal injury may be "actual or threatened." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

In a pair of environmental lawsuits relevant to this case, the Supreme Court elaborated the injury in fact requirement. In *Sierra Club,* an environmental organization alleged that it had standing to challenge the government's decision to permit development of a quasi-wilderness national park. The injury alleged by Sierra Club was that the development "would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations." *Sierra Club,* 405 U.S. at 734, 92 S.Ct. at 1366. The Court acknowledged that this was a cognizable injury, but held that it did not amount to "injury in fact" sufficient to afford standing. The Court found that the Sierra Club had not shown injury in fact because it had "failed to allege that it or its members would be affected in any of their activities or pastimes by the ... development." *Id.* at 735, 92 S.Ct. at 1366. In challenging an ICC rate increase, the plaintiff-organization in *SCRAP* tailored its allegations to conform to the Court's teachings in *Sierra Club.* In *SCRAP,* the Court found that the plaintiffs had established standing and distinguished themselves from *Sierra Club* by alleging that their members used "the forest, streams, mountains and other resources surrounding the Washington Metropolitan area" for various recreational and aesthetic purposes and that these uses would be disturbed by a chain of third-party responses to the challenged agency action. *SCRAP,* 412 U.S. at 678, 93 S.Ct. at 2411; *see id.* at 685, 93 S.Ct. at 2415. The Court thus made clear that in order to establish injury in fact for representational standing, an organization must allege facts showing that one or more of its members is among the persons injured by the challenged agency action.

■ In analyzing whether the Federation has shown sufficient injury in fact under these principles, it is important to keep in mind that the standing issue arose before the district court on the Department's motion to dismiss the Federation's complaint. This posture has two important ramifications. First, we review the allegations of the Federation's complaint. In so doing, we must accept as true all material allegations and construe the complaint in favor of the Federation. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Second, and more important, the posture affects the degree of specificity of facts which the Federation must show to establish a sufficient likelihood of personal injury to its members. *See The Wilderness Society v. Griles,* 824 F.2d 4, 16 (D.C.Cir.1987). In *SCRAP,* for example, the Court found that the plaintiff-organization's alleged injury, based only on its members' use and enjoyment of natural resources *surrounding* the Washington Metropolitan area, was enough to survive a motion to dismiss. The Court acknowledged, however, that on a motion for summary judgment, plaintiff might have to show injury with greater specificity, for example, by naming a specific forest that was used and would be affected by the challenged agency action. *See SCRAP,* 412 U.S. at 689 n. 15, 93 S.Ct. at 2417 n. 15. *See also Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 1927 n. 25, 48 L.Ed.2d 450 (1976). Mountain States argues that the Federation's standing should not be viewed from this more generous perspective because there is a preliminary injunction at issue. This argument is flawed. In *SCRAP* itself, the standing issue came before the trial court in exactly the same way as in this case—on motions to dismiss and for a preliminary injunction. The Court made clear that the defendants could not complain that the allegations in the plaintiff's complaint were not specific enough. *See SCRAP,* 412 U.S. at 689 nn. 14 & 15, 93 S.Ct. at 2417 nn. 14 & 15.

The Federation's amended complaint reads as follows:

NWF and its members are suffering and will continue to suffer injury in fact as a result of the challenged actions. Members of NWF use and enjoy the environmental resources that will be adversely affected by the challenged actions. They regularly use these resources for fishing, hunting, bird and wildlife watching, canoeing and boating, hiking, camping, and other similar activities. These persons' use and enjoyment of these resources will be irreparably injured if the defendants are permitted to terminate protective land use restrictions and thereby open up public lands to exploration, development, and disposal, without the development of land use plans, without prior preparation of adequate environmental impact statements, and without compliance with applicable laws, regulations, and procedures. Among other things, the challenged actions will adversely affect plaintiff and its members by destroying fish and wildlife habitat, and by impairing natural beauty.

The Federation appended to the complaint a list of 788 land status actions, including termination of land classifications and land withdrawals, taken by the Department pursuant to the challenged Program. The organization noted that this list was not intended to be inclusive.

Assuming the allegations of the complaint are true and construing them in the light most favorable to the organization, as we must in this posture of the case, we conclude that the Federation has alleged facts sufficient to establish injury in fact to its members. As an initial point, there is no question that harm to one's recreational, aesthetic, and environmental interests can amount to injury in fact for standing purposes. *See Sierra Club,* 405 U.S. at 734, 92 S.Ct. at 1366. The important question for our standing analysis therefore is whether the Federation's members are themselves among the injured. *See id.* at 734–35, 92 S.Ct. at 1366; *Wilderness Society,* 824 F.2d at 15. The Federation has clearly made this showing. It alleges that its 4.5 million members and supporters across the country use and wish to contin-

ue to use previously withdrawn or classified lands for recreational or aesthetic purposes, and that these persons are injured in fact when withdrawals are revoked and classifications terminated, thereby threatening continued use of the property and its resources for such purposes. The Federation asserts particularized, discrete injuries to its members as persons who regularly use areas affected by the Program for specific activities and pastimes. The Department is thus mistaken in asserting that the Federation's allegations amount to no more than a "mere interest in a problem," found to be insufficient to constitute injury in fact in *Sierra Club. See Sierra Club,* 405 U.S. at 739–40, 92 S.Ct. at 1368. This case is a far cry from *Sierra Club;* the Federation's allegations fit squarely within *SCRAP,* a case which appellants fail to mention.

Given the holding of *SCRAP,* it is difficult to pinpoint appellants' objections to the Federation's allegations of injury. At times, they appear to claim that the organization's showing fails because it has not identified any specific member who uses a particular parcel of land covered by the challenged agency action. It is unclear where appellants locate this purported requirement. No such specificity was required in *SCRAP;* the plaintiff-organization simply alleged in general terms that its five members used the natural resources surrounding a specified area allegedly affected by the challenged government action. The Federation has done the same, except that rather than identifying the affected land by geographic location or by name, it has referred to the specific land status actions taken by the Department pursuant to the Program, all of which affect specific situses identified by *Federal Register* publications. There is no difficulty discerning the land to which the Federation refers; it is the approximately 180 million acres subject to the Program's terminations and revocations.

Even if this lack of specificity were somehow fatal to the complaint, it was cured by the affidavits of two Federation members filed with the district court after issuance of the preliminary injunction. Appellants argue that the Federation's "post hoc" filings cannot excuse the district court's exercise of jurisdiction. We are not seeking such an excuse; we are inquiring whether the Federation has standing to pursue its action. From our perspective on appeal, we may properly turn to the affidavits which supply evidence in support of the Federation's allegations of injury. Both members stated that they used federal lands, including those in the vicinity of areas covered by withdrawal revocations (specifically, the South Pass–Green Mountain area of Wyoming, the Grand Canyon, the Arizona Strip, and Kaibab National Forest) for recreational uses and for aesthetic enjoyment. Both members claimed that their use and enjoyment of these lands "have been and continue to be adversely affected in fact by the unlawful actions of the Bureau and the Department." These affidavits provide a concrete indication that the Federation's members use specific lands covered by the agency's Program and will be adversely affected by the agency's actions. Mountain States contends that even these affidavits are insufficient because the named members claim only to use resources in the "vicinity" of the land covered by the challenged withdrawal revocations. The Federation's allegations in this regard however comport with those in *SCRAP;* they therefore are sufficiently specific for purposes of a motion to dismiss.

In a similar vein, the Department protests that the Federation has not shown "concrete," "discernible" injury because the harm alleged is merely hypothetical. At bottom, appellant challenges the Federation's reliance on allegations of threatened injury that allegedly will occur in the future as a result of third parties' responses to the Department's actions. We recently described the sufficiency of allegations of threatened injury as turning on "the likelihood of the occurrence of that injury." *Wilderness Society,* 824 F.2d at 12. *Wilderness Society,* like this case, involved alleged injury to the plaintiffs' use of land (and its resources) that stemmed from the expected response of third parties to the

agency action rather than directly from the agency action itself. We observed that, in such cases, "the judgment regarding likelihood of injury turns on whether the plaintiff's future conduct will occur in the same location as the third party's response to the challenged governmental action." *Id.* at 12; *see also id.* at 15. We concluded that plaintiffs must be able to allege a specific site of injury—"land that they intended to use that has been affected by [the government's action]." *See id.* at 15. In this regard, the Federation's allegations of injury suffice; because the Program acts directly on the *land* (rather than on third parties), we can be certain that the challenged agency action has affected the land areas that the Federation's members use and that the anticipated response by third parties will concern those lands. *Cf. SCRAP,* 412 U.S. at 688–89, 93 S.Ct. at 2416 (holding that more attenuated line of causation and more speculative eventual injury sufficed to survive a motion to dismiss). The members' affidavits make this clear. For example, in his affidavit, one member alleges that the Arizona Strip had been opened to the staking of mining claims, "an action which threatens the aesthetic beauty and wildlife habitat potential of these lands." In addition, the Department explained at oral argument that the Grand Canyon had been opened to nonmetalliferous mining and that the Green Mountain–South Pass area of Wyoming, originally segregated to protect small streams and adjacent riparian areas and to serve outdoor recreation purposes, has been opened to all forms of mining.

Appellants raise two additional objections that are equally unavailing. First, appellants suggests that the Federation must show that *each* of its members has standing. This assertion is clearly incorrect. In order to establish representational standing, the Federation need only demonstrate that "one or more" of its members would have standing to challenge the Department's actions. *UAW,* 106 S.Ct. at 2529; *see Warth,* 422 U.S. at 511, 95 S.Ct. at 2211. Second, appellants apparently argue that the Federation only has standing to seek relief pertaining to those specific tracts as to which it can demonstrate a concrete interest; that is, appellants appear to contend that the Federation must adduce facts sufficient to establish standing for one (or more) of its members with respect to each specific tract of land at issue. This assertion is not only unsupported by the caselaw, but is also illogical. The Federation is essentially challenging an alleged pattern of agency action embodied in the Department's conduct of its Program. If the organization can establish that the Department's actions as to one parcel of land are unlawful because the procedure by which the agency terminates classifications and revokes withdrawals fails to comply with FLPMA, then it has established the illegality as to all the lands at issue which have been affected by the unlawful procedure. In such a situation, the Federation need not demonstrate that it is injured by each and every agency action which flows from the implementation of the unlawful Program. *See, e.g., Sierra Club v. Adams,* 578 F.2d 389, 391–93 (D.C.Cir.1978). Concrete particularized injury to any one of its members with regard to any covered land is sufficient.

In sum, we conclude that the Federation has alleged facts that demonstrate that the actions of the Department threaten to harm the cognizable interests of the Federation's members. Consequently, we find that the Federation has alleged injury in fact sufficient to establish standing to pursue its two FLPMA claims against the Department.

In addition to challenging the Federation's standing to prosecute Counts I and VII of its complaint, the Department challenges the district court's holding that Representative Seiberling has standing to pursue his independent claim, which mirrors Count II of Federation's complaint (challenging the Department's failure to seek Presidential or Congressional review of the proposed land status actions). Indeed, the Department goes so far as to suggest that the issue of whether a congressman has standing to protect his right to participate in the legislative process may be appropriate for *en banc* consideration by this court.

We decline to reach this issue. The Federation's claims in Count II of its complaint are not relevant to the district court's issuance of the preliminary injunction, which is the issue before us on appeal. The district court grounded its injunction order on the Federation's likelihood of success on the merits of its other two separate FLPMA claims, Counts I and VII of its complaint. Accordingly, the issues of congressional standing in general, and Representative Seiberling's standing in particular, are not before us.

### B. *Absent Third Parties*

■ Appellants devote a large portion of their energies to arguing that the injunction impermissibly affects the rights and interests of absent third parties over whom the district court has no personal jurisdiction. Appellants couch their argument in both jurisdictional and due process terms. They contend that the district court lacked jurisdiction to issue a preliminary injunction allegedly affecting the interest of these nonparties. They also contend that the injunction offends principles of due process because it deprives third parties of their property rights without notice and an opportunity to be heard.

Appellants' jurisdictional argument is unsound. The district court has not exercised jurisdiction over any party beyond its lawful reach. The injunction does not compel any absent party to take any action, nor does it prohibit any absent party from acting in any way. As the district court held, "the preliminary injunction enjoins only federal defendants. Third parties are not subject to its prohibitions." Feb. 10th Order at 10. The district court clearly has subject matter jurisdiction to review executive actions for their compliance with a statutory mandate, *see* 28 U.S.C. §§ 1331, 1346, and it has personal jurisdiction over the federal defendants.

While acknowledging that the district court modified its order so that nonparties are not expressly enjoined, appellants argue that the practical effect of the injunction is the same on these nonparties. They argue that in enjoining the Department's approval of nonparties' applications for land development interests, the court has in effect enjoined the nonparties from exercising their property rights. We do not agree. The order does not deprive any person or entity who is not before the court of his property rights. The injunction does not invalidate existing mining claims or mineral leases. Indeed, the order explicitly allows holders of existing mining claims to continue to satisfy the legal requirements to preserve those claims. Mountain States complains that such claims and leases may be void *ab initio* if they were initiated before the land was lawfully available for entry. However, the injunction simply *suspends* the classification and withdrawal terminations under the Program; it does not reinstate the original withdrawals and classifications. Thus, the court's order does not upset these interests. Nor does it overturn completed sales or exchanges of previously withdrawn lands. The injunction addresses only the Department's ability to convey legal title to private persons in the future. If title has already vested in third parties, their right to use and enjoyment of that property is not affected by the court's order. Similarly, the injunction does not affect the contractual rights of third parties; these parties remain fully able to make any claim arising under their contracts. The preliminary injunction merely preserves the *status quo* by preventing the staking of new mining claims, the issuance of additional mining leases, and the loss of additional public lands to private interests via sale or exchange.

The injunction's only actual effect on third parties is lost or delayed opportunity to consummate transactions for the purchase or use of federal lands in the future. These interests, however, are not constitutionally protected property rights. The absent third parties to whom appellants refer stand in various stages in the process of perfecting their interests in the lands at issue. Some parties have staked initial claims, or taken other preliminary steps, but require BLM to take further action before they can complete their development projects. The injunction prohibits the BLM from acting to further these projects dur-

ing the pendency of this litigation (presuming such action would conflict with the original classification or withdrawal). Thus, some third parties are delayed in obtaining certain interests—*e.g.*, receiving approval to drill oil and gas wells on leases issued prior to the injunction, perfecting final entries, obtaining patents under the land laws—as a result of the injunction. But these absent parties have no contractual or legal right to additional BLM permits or approvals. *See, e.g., Lewis v. Hickel,* 427 F.2d 673, 676–77 (9th Cir.1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed. 2d 440 (1971); *Angelina Holly Corp. v. Clark,* 587 F.Supp. 1152, 1156 (D.D.C. 1984). They hold no more than an expectancy, the loss of which does not constitute a deprivation of property within the meaning of the due process clause of the Constitution. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980); *National Consumer Information Center v. Gallegos,* 549 F.2d 822, 828 (D.C.Cir.1977). Their absence from the lawsuit does not preclude the district court from issuing the preliminary injunction. *Compare Ohio ex rel. Brown v. Callaway,* 497 F.2d 1235, 1241 (6th Cir.1974) (holding that contract with construction company rendered inequitable a preliminary injunction restraining the contractors from performing the contractual obligations).

## C. *Exhaustion*

■ Mountain States asserts that the Federation failed to exhaust its administrative remedies with regard to land classification terminations. FLPMA itself imposes no exhaustion requirement in this context, so Mountain States must look to Departmental regulations. Appellant argues that the Federation could have and should have raised its land use planning and public participation claims through administrative appeals of individual land classification terminations to the Interior Board of Land Appeals (the IBLA). The district court specifically found that the administrative avenues of review touted by Mountain States were not open to the Federation. We agree.

According to Mountain States, the Federation had recourse to the agency's general procedures for appeals on public land issues. The Department's regulations provide, in relevant part, that

(a) Any party to a case who is adversely affected by a decision of an officer of the Bureau of Land Management or of an administrative law judge shall have a right to appeal to the [IBLA].

43 C.F.R. § 4.410(a) (1986). Mountain States argues that the district court erred in holding that because the regulations refer only to a "party to a case" as having the right to appeal, the Federation had no access to appellate review. Appellant apparently concedes that the Federation cannot be considered a "party" to any discrete classification termination conducted pursuant to the Program. It asserts, however, that the IBLA construes the rule liberally to vest the right of appeal in "anyone adversely affected" by any Department decision. In support of this proposition, Mountain States cites two cases, *Desert Survivors,* 80 IBLA 111 (1984), and *Park County Resource Council v. Department of Agriculture,* 613 F.Supp. 1182 (D.Wyo.1985), *aff'd,* 817 F.2d 609 (10th Cir.1987).

Neither case relied upon by Mountain States provides authority for an organization that is not a party to the underlying proceeding to appeal from a discrete classification termination decision. In *Desert Survivors,* an environmental organization which had actively and extensively participated in the formulation of the land use plans for the lands in question protested approval of a mining plan and then appealed the denial of that protest to the IBLA; unlike the Federation, the organization was a "party to [the] case." The status of the appellant in *Park County Research Council* is less clear. It appears, however, that the organization was involved in an on-going interchange with BLM concerning the issuance of a drilling permit, and when BLM granted the permit, the organization appealed the decision to the IBLA. *See* 613 F.Supp. at 1184–85. It would appear, therefore, that the organization was also a party to the case as to that issue. More-

over, with regard to the organization's challenge to BLM's decision not to draft an EIS before pursuing its proposed action, the Tenth Circuit reversed the district court's holding that the plaintiff had failed to exhaust its administrative remedies by not appealing to the IBLA. The court specifically found that "[n]either the IBLA nor any other administrative forum was available to plaintiffs at the time of suit." 817 F.2d at 619. Thus, there is no indication in either case that the IBLA interprets its regulation to permit *anyone* adversely affected by a Department decision to appeal. In the absence of such a clear agency interpretation, we are constrained to find that the rule means what it says: only a "party" to a proceeding that culminates in a classification termination decision may appeal that decision to the IBLA. We thus conclude that the Federation had no right to appeal any of the challenged classification terminations pursuant to this regulation. Consequently, the organization cannot be charged with failure to exhaust administrative remedies.

Even if petitioners could have appealed to the Board under § 4.410(a), we do not believe that the district court erroneously refused to require them to do so. Where, as here, the doctrine of exhaustion of administrative remedies is not mandated by statute or regulation, "its application rests within the sound discretion of the trial court." *Southeast Alaska Conservation Council v. Watson*, 697 F.2d 1305, 1309 (D.C.Cir.1983). Absent such statutory command, exhaustion is a flexible requirement, tailored to "an understanding of its purposes and of the particular administrative scheme involved." *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). Ordinarily, further administrative review serves to allow the agency to make a factual record, to exercise its discretion, or to apply its expertise. It permits the agency to discover and correct its own errors and prevents the deliberate disregard of administrative processes through premature judicial intervention. *Id.* at 194–95, 89 S.Ct. at 1663.

None of these purposes would be served by requiring additional exhaustion here.

Plaintiff has sought to present its objections to the agency by various methods: letters to the Secretary, letters to the BLM director, and numerous discussions with Interior and BLM officials. Agency officials were afforded ample opportunity to reflect on petitioners' contentions, to apply their expertise, and to "correct [any] error if error there be," *Brotherhood of Rail. Trainmen v. Chicago M., St. P. & P.R. Co.*, 380 F.2d 605, 608, *cert. denied*, 389 U.S. 928, 88 S.Ct. 289, 19 L.Ed.2d 279 (1967). "So long as the appellant * * * has put an objection on the record, the obligation to exhaust is discharged." *Safir v. Kreps*, 551 F.2d 447, 452 (D.C.Cir.1977).

The agency's failure to raise the exhaustion defense, coupled with a continuous course of action demonstrating a commitment to its view of the law, indicated to the district court that further administrative process would be futile. From the agency's silence, the court reasonably surmised that the Department had nothing more to add. Cf. *Asarco Inc. v. EPA*, 578 F.2d 319, 320–21 n. 1 (D.C.Cir.1978) ("The agency's failure to insist upon exhaustion * * * suggests that, in [its] view, the costs * * * do not outweigh the benefits of [the] court's immediate consideration [of the issues on appeal].") In addition, the district court predicted that appellants would not change their mind on key legal questions during the course of any further hearings. The administrators have forged ahead with plans to modify the status of millions of acres of land despite continuous objection by petitioners over several years. Appellants have clearly considered and rejected plaintiffs' view of the statute's requirements for public participation and the timely promulgation of new Plans. Contrary to the dissent's implication, evidence that an agency has made up its mind on the law *is* relevant to the question of futility. *See, e.g., NRDC v. Train*, 510 F.2d 692, 703 (D.C.Cir.1975); *Athlone Industries v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485, 1489 (D.C.Cir.1983); *Committee for GI Rights v. Callaway*, 518 F.2d 466, 474 n. 20 (D.C.Cir.1975). Therefore, the court did not abuse its discretion by relying on the

Department's irreversible commitment to its view of the law.

In concluding that the district court abused its discretion on exhaustion, the dissent assumes that the "factual" inquiry which it deems necessary to establish irreparable injury would be undertaken by the agency in hearings held to satisfy an exhaustion requirement. The prediction that the directed factual inquiry touted by the dissent would be conducted is simply implausible. In any appeal to the Board under 43 C.F.R. § 4.410(a), the focus of plaintiffs' objection would likely be, not the adverse effects of any particular termination decision or its consequences, but the statutory adequacy of the pre–FLPMA plans and the legal authority of the BLM to terminate classifications under the FLPMA. Since the disposition of plaintiffs' objections before the Board would inevitably turn on the threshold resolution of legal issues on which the Department has made its position clear, the district court's rejection of the exhaustion defense was plainly appropriate.

#### D. *Laches*

■ Mountain States also argues that the district court erred in not finding that the Federation's claims are barred by the doctrine of laches. Appellant contends that publication in the *Federal Register* put the Federation on constructive notice of the withdrawal revocations and land classification terminations under the Program and that the organization unreasonably delayed in lodging its objections. Mountain States asserts that during the period between 1981 and the institution of this lawsuit, third parties relied on the apparent regularity of the Department's actions and made significant investments in the affected lands. In Mountain States' view, this detrimental reliance combined with the Federation's delay supports a finding of laches and bars issuance of a preliminary injunction as to the Department's past actions.

Mountain States never raised this issue before the district court. Ordinarily, issues and legal theories not asserted at the dis-

trict court level will not be heard on appeal. *See District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084 (D.C.Cir.1984). "[O]ur procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact." *Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). We do not believe that this case warrants departure from the normal rule. Laches is an affirmative defense that requires findings that the plaintiff delayed inexcusably or unreasonably in filing suit and that the delay was prejudicial to the defendant. *See Rozen v. District of Columbia,* 702 F.2d 1202, 1203 (D.C.Cir. 1983). Whether the doctrine of laches bars an action depends upon the particular circumstances of the case. *See Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 843 (D.C.Cir.1982). The analysis is in large part fact-based and, in any event, is primarily addressed to the discretion of the trial court. *See Park County Resource Council,* 817 F.2d at 617 (noting judicially recognized principle that laches must be invoked sparingly in environmental cases); *Concerned About Trident v. Schlesinger,* 400 F.Supp. 454, 478 (D.D.C.1975), *aff'd in part, rev'd in part on other grounds,* 555 F.2d 817 (D.C.Cir. 1977). In such circumstances, it would be especially imprudent for an appellate court to address the issue in the first instance.

Having resolved these preliminary issues, we turn finally to consider the soundness under traditional equity standards of the district court's issuance of the preliminary injunction.

#### III. THE PRELIMINARY INJUNCTION

■ It is well-settled that the district court must consider four factors in deciding whether a plaintiff is entitled to a preliminary injunction: (1) the plaintiff's likelihood of success on the merits; (2) the threat of irreparable injury to the plaintiff absent the injunction; (3) the possibility of substantial harm to other parties caused by issuance of the injunction; and (4) the public interest. *See Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312–13, 102 S.Ct.

1798, 1803, 72 L.Ed.2d 91 (1982); *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 842–43 (D.C.Cir.1977). After weighing these factors, the district court concluded that a preliminary injunction should issue in this case. Appellants challenge the court's determination, asserting that each factor in the traditional preliminary injunction inquiry counsels dissolution of the injunction.

A district court's decision to grant or deny a motion for preliminary injunction is reversible only for abuse of discretion. *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 151–52 (D.C.Cir.1985). In making its decision, the district court makes findings of fact, conclusions of law, and determinations about the balancing of the injunction factors. As to each, we owe the district court deference. We are most deferential to the court's balancing of the four injunction factors. *See id.* at 151–52. Questions of fact are reviewed under the clearly erroneous standard. *See Amoco Production Co. v. Village of Gambell, Alaska*, — U.S. ——, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987); *Foundation on Economic Trends*, 756 F.2d at 152. Although we are least deferential on legal issues, "we ordinarily do not consider the merits of the case further than necessary to determine whether that discretion was abused." *National Organization for Women v. SSA*, 736 F.2d 727, 733 (D.C.Cir.1984) (internal quotes and footnote omitted). We should overturn the district court's decision "when it rests its analysis on an erroneous premise or is clearly wrong in reaching its conclusions." *White House Vigil for ERA Committee v. Watt*, 717 F.2d 568, 571 (D.C. Cir.1983). With these principles in mind, we examine the district court's decision to issue the preliminary injunction.

### A. Likelihood of Success on the Merits

In considering the Federation's likelihood of success on the merits, the district court considered only two of the Federation's claims: first, that the Department's termination of land classifications without first preparing Plans violated FLPMA; second, that the Department failed to provide for public participation in their withdrawal revocation decisions contrary to FLPMA's command. It is undisputed that if the Federation ultimately prevails on these two FLPMA claims, it could obtain the permanent injunction it ultimately seeks. Thus, in light of the district court's conclusion that the Federation will likely succeed on these two counts, it correctly declined to reach the merits of the Federation's other claims. We review then the court's determination as to these two counts. We find that although the merits are close, the court did not rest its analysis on any erroneous premise and was not clearly wrong in the conclusions it reached; we therefore conclude that the court did not abuse its discretion in finding that the Federation is likely to succeed on the merits of these claims.

### 1. Failure to Review Land Status Actions in the Context of Land Use Planning

As explained earlier, FLPMA established substantive land management criteria for public land, required the Department to engage in land use planning, and preserved withdrawals and classifications already in effect. Section 202 of the Act, which concerns classifications, directs the Secretary of the Interior to develop and employ "land use plans," which establish the use to which tracts and areas of federal lands may be put. 43 U.S.C. § 1712(a). This obligation applies regardless of whether the land has been previously classified. *See id.* Subsection (d) further provides:

> Any classification of public lands or any land use plan in effect on October 21, 1976, is subject to review in the land use planning process conducted under this section, and all public lands, regardless of classification, are subject to inclusion in any land use plan developed pursuant to this section. The Secretary may modify or terminate any such classification consistent with such land use plan.

43 U.S.C. § 1712(d). Department regulations identify the land use plans developed pursuant to FLPMA as Plans. *See* 43 C.F.R. § 1610.0–5(1). It is undisputed that the Department had completed only a miniscule number of Plans for the land covered by pre–1981 classifications during its implementation of the Program. The Department instead relied on Management Framework Plans (MFPs), developed before FLPMA's enactment under the C & MU Act in terminating the disputed land retention classifications under the Program.

The district court found that the Department's reliance on MFPs did not satisfy the statutory expectations of "land use plans." The court found that MFPs "are not identical substitutes" to Plans. Dec. 4th Order at 16. The court acknowledged that Congress anticipated that the agency would have to rely on MFPs for a certain period, until Plans were developed for all tracts of federal lands, but the court concluded that Congress only approved temporary reliance on MFPs, and that nine years was excessive. The court thus concluded that the Federation was substantially likely to succeed in establishing that the Department had violated FLPMA by terminating the classifications on 160 million acres of land without following the statute's criteria for land use plans.

Appellants argue that MFPs have been and continue to be legally adequate land use plans under FLPMA and therefore the Department reasonably relied on them in the terminations at issue. In support of this proposition, appellants cite language in the legislative history of FLPMA that indicates that Congress was aware of BLM's pre–FLPMA land use planning systems and "found them to be consistent in general principles and practices with the objectives of [the new legislation]." H.R.Rep. No. 1163, 94th Cong., 2d Sess. 5 (1976), U.S. Code Cong. & Admin.News 1976, pp. 6175, 6179. Appellants argue that this language, coupled with a reference in section 302(a) to the use of land use plans prepared under section 202 "when they are available," 43 U.S.C. § 1732(a), indicates that Congress sanctioned the agency's termination of classifications without having prepared Plans.

Finally, the Department argues that the district court's holding is contradicted by *National Resources Defense Council, Inc. v. Hodel (NRDC)*, 624 F.Supp. 1045 (D.Nev. 1985), *aff'd*, 819 F.2d 927 (9th Cir.1987). None of appellants' arguments persuades us that the district court was clearly wrong in reaching its conclusion.

A fair reading of the statute and the Department regulations convinces us that Plans and MFPs are not equally adequate to meet FLPMA's requirements with regard to establishment of land use plans. It is true that nothing in the Act or the legislative history distinguishes between MFPs and Plans. But the agency itself has identified the Plans as the land use plans mandated by the Act. Departmental regulations describe what the Plans are designed to generally establish and how they conform with the criteria for development and revision of land use plans stipulated by section 202 of FLPMA. The regulations then rehearse lengthy provisions regarding the procedures for development of Plans in order to comply with FLPMA requirements. *See* 43 C.F.R. Subpart 1610. The regulations also provide for the use of MFPs during a "transition period" until they are superseded by Plans. *See id.* at § 1610.8. The Department contends that the regulations permit reliance on MFPs under this section only if they conform to the prescribed planning standards of section 202 of FLPMA. But the regulations themselves belie this contention. There is nothing in the regulations that necessitates or directs such conformity. The regulations provide that the Department may rely on MFPs only if they comply with "the principle of multiple use and sustained yield and shall have been developed with public participation and governmental coordination." *Id.* § 1610.8(a)(1). These factors do not bring the MFPs into conformity with section 202; section 202 requires considerably more of the Department in establishing land use plans under FLPMA. These requirements include "use [of] a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sci-

ences, ... giv[ing] priority to the designation and protection of areas of critical environmental concern, ... [and] weigh[ing] long-term benefits to the public against short-term benefits." 43 U.S.C. § 1712(c). Management decisions reached under MFPs' limited criteria may be very different from those reached under Plans' criteria. Mountain States' contention that FLPMA works no change to the way in which BLM was to conduct land use planning is contradicted not only by the comprehensive statutory system but also by the Department's own regulations, which contemplate and instruct the development of entirely new land use plans to comply with FLPMA and to be called Plans. Although BLM's pre–FLPMA management system, as expressed in MFPs, may have conformed to the "general principles" of FLPMA, Congress did not approve the extended use of existing plans in place of the plans mandated for development under FLPMA.

The Department's contention that Congress authorized BLM to proceed with management of the public lands using existing MFPs does not support its action. The Department relies on FLMPA's provision that

> The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available.

43 U.S.C. § 1732. This section evinces Congress' recognition that Plans would not be ready immediately and arguably speaks to Congress' intention that the Department's hands not be tied pending completion of the Plans. But this section cannot be read to override the specific language of section 202(d), the sole provision of the Act regarding modification of land use classifications, which provides that existing classifications may be modified or terminated only pursuant to FLPMA–developed land use plans. Moreover, the two provisions are not necessarily incompatible. There are presumably many management decisions embracing multiple use and sustained yield principles that do not necessitate ter-

minating existing classifications; most C & MU classifications dedicated lands to multiple uses. Thus, the Act may reasonably be understood as permitting the Department to continue relying on existing MFPs with regard to those management decisions not involving termination of classifications. In any event, in light of section 202(d)'s plain language, we cannot find that the district court was clearly wrong in concluding that Congress did not sanction the termination of classifications covering the vast majority of federal lands outside the context of FLPMA land use plans.

Finally, *NRDC v. Hodel, supra,* does not contradict the district court's determination. The Department contends that the Ninth Circuit implicitly held that MFPs established by regulations and used by BLM for over ten years are valid under FLPMA. Actually, the holding of the case is not nearly so broad. In *NRDC,* environmental groups challenged certain livestock grazing decisions made by the BLM. The issue for the court's review was the adequacy of a specific MFP covering grazing in the Reno, Nevada area. The Ninth Circuit characterized the plaintiffs' complaint as "a challenge to the BLM's policy decision to postpone livestock grazing adjustment until reliable data was available." *NRDC,* at 930. The court held simply that the BLM's method of providing for grazing under the MFP did not violate FLPMA. *See id.* at 930. The adequacy under FLPMA of a single, specific MFP with regard to one planning decision has no relation to the lawfulness of the overall pattern and practice of the Department in ignoring FLPMA's land use planning requirements in terminating protective classifications under the Program. Contrary to the Department's assertion, *NRDC* does not stand for the proposition that MFPs are interchangeable with Plans for purposes of developing satisfactory land use plans under the Act.

It may be that when the district court proceeds to consider the merits of the claims on final review (or on summary judgment), it will conclude that the MFPs conform with the section 202 FLPMA land use planning criteria. However, the most

reasonable inference drawn from the statute and from the Department's own regulations is that MFPs were not designed to and do not comply with FLPMA. Thus, we cannot find that the district court abused its discretion in concluding that the Federation is likely to succeed in proving that the Department violated FLPMA in terminating classifications without first having developed Plans for the covered land.

### 2. Failure to Provide for Public Participation in Connection With the Revocation of Land Withdrawals

FLPMA contains numerous provisions for public participation in the Department's decision-making. FLPMA states broadly that

> The Secretary shall allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands.

Id. § 1712(f). More particularly, section 309(e) of FLPMA directs the Secretary to provide for public participation in "the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1739(e) (emphasis added). The district court found that withdrawal revocations fall into the "management" category of section 309(e). Since the Department did not permit public input for its decisions to revoke land withdrawals under the Program, the court concluded that the Federation is likely to succeed on its claim that the Department violated section 309(e) of the Act. We can locate no evidence that this determination was incorrect.

Appellants proffer several arguments in opposition to the district court's conclusion, all of which are impotent. First, appellants contend that the statutory language of section 309(e) does not extend to the Secretary's withdrawal revocation authority under section 204 of FLPMA. In support of

this interpretation, they call upon the Act's legislative history. But, in fact, the legislative history does not speak to the issue, although there are strong indications that Congress intended some form of public input for all decisions that may have significant impact on federal lands. See, e.g., H.R.Rep. No. 1163, 94th Cong., 2d Sess. 7 (1976), U.S.Code Cong. & Admin.News 1976, p. 6181. The Department also argues that the district court's reading renders section 204(h) superfluous. Section 204(h) provides that the Department may promulgate new withdrawals only after it has afforded an opportunity for a public hearing. See 43 U.S.C. § 1714(h). Contrary to the Department's position, there is nothing incongruous between this provision and the court's reading of section 309(e). The fact that Congress specifically mandated that a "hearing" precede new withdrawals does not mean that it did not contemplate some form of public participation, short of a public hearing, in connection with withdrawal revocations.

In a related argument, appellants contend that Congress intended public participation only in the context of the land use planning process, as opposed to individual BLM revocation decisions. This interpretation of section 309(e), however, reads "the management of public lands" language out of the statute. The section already provides for public input into "the preparation and execution of plans and programs for ... the public lands." 43 U.S.C. § 1739(e). Such a negation of Congress' explicit language offends well-settled principles of statutory interpretation. See, e.g., American Textile Manufacturers Institute, Inc. v. Donovan, 452 U.S. 490, 513, 107 S.Ct. 2478, 2492, 69 L.Ed.2d 185 (1981).

The Department contends that it satisfies section 309(e)'s requirement for public participation by providing for public participation in the development of the land use plans and in specific disposal decisions made after the revocation, such as the decision whether to issue a lease or whether to conduct a sale or exchange. The appellants' contention that section 309(e)'s public participation requirement is satisfied by further provision for public input into par-

ticular disposal decisions fails to answer the specific requirements of the statute: withdrawal revocations are themselves major management decisions. Permitting the change in status of land from retention (even if for limited purposes) to disposal (even if for limited purposes) raises issues and concerns that are not the same as those that might arise when deciding how or to whom to dispose the land. Evaluating the repercussions of opening millions of acres to potential development entails different and graver considerations than judgments concerning the local impact and advisability of uses for particular parcels. The patchwork of provision for public comment on specific disposals cannot adequately substitute for public input into this important aspect of comprehensive planning. In addition, the discretionary nature of these public participation requirements dictates that many individual land disposal decisions will never be subject to meaningful public scrutiny.

In effect, the Department's practices have insulated large-scale withdrawal revocation programs such as these from public oversight, since the public has never been directly involved in formulating a systematic approach to withdrawal revocations. This total absence of public input into sweeping policy decisions affecting vast tracts of public land effectively frustrates the public participation requirement. For this reason, we cannot find that the district court was clearly wrong in deciding that section 309(e) of FLPMA contemplates some form of public participation in the Department's decision to revoke withdrawals on federal lands. We therefore conclude that the court did not abuse its discretion in concluding that the Federation is likely to succeed on its claim that the Department violated FLPMA in revoking withdrawals under the Program without affording opportunity for public input.

## B. *Irreparable Injury*

The district court had "no problem in holding that [the Department's] actions in lifting protective land restrictions will irreparably injure [the Federation's] members unless enjoined, ... [because the De-

partment has] removed the only absolute shield against private exploitation of these federal lands." Dec. 4th Order at 18. The court explained that although classification terminations and withdrawal revocations do not immediately open the lands to exploitation, the agency's actions leave no prohibitions on development in place: statutes and regulations can only regulate its process. The court stressed that any mining or leasing could cause irreparable injury by permanently destroying wildlife habitat, air and water quality, natural beauty, and other environmental and aesthetic values and interests. Moreover, sales, leases, and procedures whereby mining interests can gain exclusive use of the land would permanently remove the land from the public domain and enjoyment. In conclusion, the court stated that "[w]ithout the preliminary injunction, [the Department's] termination of classifications and withdrawals could lead to the permanent loss of lands to public use and enjoyment—an injury we feel would be irreparable." *Id.* at 19.

To the extent we can decipher appellants' objections to the district court's determination, we are not convinced that they should lead us to reverse the court's finding of irreparable injury as clearly erroneous. The Department begins its challenge by asserting, without elucidation, that the district court ignored the teaching of the Supreme Court in *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), and *Amoco Production Co. v. Village of Gambell, Alaska*, —— U.S. ——, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). The Department's invocation of these cases is baffling. In both cases the Supreme Court reviewed a lower court's holding that a specific statute prohibits courts faced with an alleged violation from relying on remedies other than an immediate prohibitory injunction. *See Gambell*, 107 S.Ct. at 1398 n. 1 (Alaska National Interest Lands Conservation Act); *Romero-Barcelo*, 456 U.S. at 306–07, 102 S.Ct. at 1800 (Federal Water Pollution Control Act). In both cases, the Court concluded that in drafting the statute at issue, Congress did not intend to deny courts their traditional

equitable discretion. *See Gambell,* 107 S.Ct. at 1403; *Romero-Barcelo,* 456 U.S. at 320, 102 S.Ct. at 1807. Accordingly, the Court directed the courts to engage in the traditional injunction inquiry, which is just the inquiry the district court conducted in this case. Unlike the lower courts in *Gambell* and *Romero-Barcelo,* the court did not *presume* irreparable injury; it examined the Federation's allegations and showings and determined that its members would be irreparably harmed absent the preliminary injunction. *Compare Gambell,* 107 S.Ct. at 1402. Thus, contrary to the Department's assertion, the district court followed the teaching of the Supreme Court in these two cases.

We reject appellants' suggestion that the district court was constrained to require the Federation to proffer specific evidence as to each tract of land, detailing just how the Department's further action pursuant to its Program would cause its members irreparable harm. The district court's determination about " 'what evidence can properly be adduced in the limited time that can be devoted to a preliminary injunction hearing' " is entitled to substantial deference. *Foundation on Economic Trends,* 756 F.2d at 151 (quoting *Friends for All Children, Inc. v. Lockheed Aircraft Corp.,* 746 F.2d 816, 835 n. 32 (D.C.Cir.1984)). Given the breadth of the agency's action, the enormity of the land affected, the duration of the Program, and the preliminary nature of the proceeding, we cannot fault the court for not having further particularized its findings.

The record before the district court was complete enough to allow it to decide that any further action by the Department would irreparably harm the Federation's members' interests. The Federation alleged that absent preliminary relief its members would suffer irreparable damage because irreparable damage will be done to tracts of public land they use. The Federation has delineated specific ways in which, in the absence of the injunction, its members' interests in conserving natural resources for their aesthetic, recreational, and environmental use and enjoyment will be irreparably injured. In most instances,

the original purpose of a withdrawal was to ensure that the lands so designated be retained in federal ownership and thereby serve public rather than private purposes; in the absence of such retention, the Department may take action, such as sales and exchanges, which would result in permanent loss of those lands to public access and enjoyment. Mountain States estimates the number of land exchanges and sales that have been completed or are currently being planned and negotiated to be in the thousands. In addition, in the absence of injunction, the Department is at liberty to grant rights of way, leases, permits, and easements, which may themselves substantially impair resource values. Pursuant to the Program, 13 million acres have been opened to mining. Under federal mining laws, anyone can enter open public lands, undertake excavation, stake mining claims, and set up mining operations. *See* 30 U.S. C. §§ 22, 23, 27, 35 (1982); *see also* 43 C.F.R. § 3809.0–6 (1986). Mining operations in turn have substantial adverse effects on scenery, wildlife, recreation, and other environmental values. Further, lands opened to mining may be permanently lost to the public under mining laws because mining claimants enjoy enforceable rights to exploit the minerals that they find and may proceed to gain title in fee simple. *See Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978). Finally, about 8 million acres have been opened to mineral leasing and 4.4 million acres have been opened to oil and gas leasing. The Leasing Act does not limit the Department's leasing authority, see 30 U.S.C. § 226(b), and pre-exploration and exploration activities often can begin soon after leases are awarded. These activities can cause immediate and direct physical damage to public lands. *See, e.g.,* BLM, *North Fork Well Final Environmental Impact Statement* (May 9, 1985) at 60–61 (detailing unavoidable impacts associated with exploratory drill site, including big game habitat displacement, loss of visual resources, and loss of recreation setting). Mountain States asserts that 7,000 mining claims have been located and

1,000 mineral leases have been issued on lands that were previously closed to mining or mineral leasing.

Appellants do not, nor could they reasonably, argue that the injuries the Federation and the district court envisioned would not be irreparable. Mountain States, however, challenges the Federation's showing on other grounds, all of which we reject. At times, Mountain States maintains that the Federation must demonstrate as a matter of fact that its members have already suffered irreparable injury from the Department's actions. This contention is absurd. A preliminary injunction is designed to *prevent* irreparable injury; its value would be totally eviscerated if the plaintiff had to show that the harm had already occurred before the court could issue the injunction.

At other times, Mountain States concedes that a showing that plaintiff *will* suffer irreparable injury is sufficient, but contends that such a showing cannot be made here because the potential irreparable harms are too remote: with the exception of locating mining claims, all other forms of entry are dependent on the Secretary's exercising his discretion to permit entry. In this regard, Mountain States appears to misunderstand the purpose of the preliminary injunction; it is designed precisely to prevent the Secretary from exercising his discretion in circumstances in which it likely would lead to irreparable injury. Furthermore, the harm is not so remote as appellant suggests. Mountain States' own position that the injunction impermissibly affects the interests of absent third parties demonstrates with ample illustrative examples that these parties are chomping at the bit to develop the interests in the federal lands under the Program. Appellant made clear that but for the injunction, the Secretary would be exercising his discretion to permit entry to many third parties. And the imminent actions, which include transfers, sales, and mineral and mining developments, would trigger the very irreparable harms the Federation has alleged.

Finally, Mountain States contends that the Federation has failed to demonstrate an adequate connection between its individual members and the threatened harm. Appellants' argument mirrors its standing claim and suffers from the same infirmity. As noted earlier, the affidavits supplied by the Federation specifically identify locations where its members' interests are threatened by the Department's actions in lifting restrictions on mining and other forms of natural resource exploitation. Indeed, according to the Department, mineral claims have already been staked in an area in which one member uses and enjoys the resources.

At bottom, appellants' argument is that the district court's preliminary injunction is overbroad. Appellants observe that only about 14% of the total acres subject to the injunction have been opened to mining or some form of natural resource leasing, and claims have been issued on only a small portion of those lands. Appellants argue that the injunction for the most part enjoins activity that poses no threat to the Federation's members' interests. The Federation has admitted that its priority is contesting the opening of the land to mineral exploration and mining, but these activities are not the only threats to the members' interests. The Federation is also concerned about public lands being opened to settlement, agricultural uses, sales, and exchanges. Such disposals, especially sales and exchanges, can deprive the members of the use and enjoyment of the lands' resources altogether. Pursuant to the classification terminations, millions of acres have been opened to such uses. The evidence reveals that there have already been more than 260 agricultural entries, more than 430 proposed sales, and some 60 proposed land exchanges. The evidence of overbreadth is therefore far less compelling than appellants would have us believe.

There may be instances in which a proposed land use or disposal would not cause irreparable harm to the Federation's members' interests. But this does not necessitate the dissolution of the preliminary injunction. The district court retains the power to modify the injunction in the exercise of its sound discretion. In fact, the district court has implemented a procedure

whereby specific tracts of land may be exempted from the preliminary injunction upon a proper showing. In our view, this procedure adequately protects the rights of third parties and the Department from any potential overbreadth in the injunction order.

### C. *Possibility of Harm to Other Parties*

When considering a motion for preliminary injunction, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Gambell*, 107 S.Ct. at 1402; *see also Romero-Barcelo*, 456 U.S. at 312, 102 S.Ct. at 1803. In deciding to issue the preliminary injunction, the district court acknowledged that the injunction would harm third parties by barring holders of claims and leases from developing their interests and by delaying the investment return of those who have made investments to obtain access to or use of the lands covered by the injunction. The court noted, however, that the injunction itself would not sever these parties' interests, but only delay their realization. In light of this assessment, the court concluded that the injury to third parties was not "so serious as to outweigh the other factors supporting the injunction." Dec. 4th Order at 19.

In arguing that the district court's balancing of the competing interests was defective, appellants simply reiterate their prior arguments: the threat of irreparable harm to the Federation's members absent the injunction is remote, speculative, and slight, whereas the harm to third parties as a result of the injunction is immediate and palpable. We have already addressed appellants' attempts to belittle the threat of irreparable harm; their attempts to inflate the injury to third parties is equally hollow. The court was careful to craft the injunction so that third parties' interests would be adversely affected as little as possible. The injunction does not invalidate existing mining claims or mineral leases, nor does it overturn completed sales or exchanges. The post–1981 revocations and terminations are "suspended," not voided; therefore, the mining leases and claims issued during that time are not invalidated. The possible harm to third parties is delay, a cloud on title (which would have been caused to some degree by the litigation itself, even absent the preliminary injunction), and investment costs. The district court reasonably held that the permanent loss of aesthetic values and environmental resources, not to mention access to the land itself, outweighed the possible injury to third parties due to the preliminary injunction.

### D. *The Interest of the Public*

The district court held that "the public interest clearly favors granting the preliminary injunction." Dec. 4th Order at 20. This conclusion relied predominantly on FLPMA's policy statement announcing the importance of ensuring orderly procedures for removing certain federal controls over government-owned lands. *See* 43 U.S.C. 1701(a)(1). The court reasoned that if the agency had violated FLPMA's procedures, the injunction would protect against further illegal action pending resolution of the merits. In addition, the court held that the injunction would serve the public interest in protecting the environment from any threat of permanent damage. The court concluded that although the preliminary injunction would inconvenience the Department and those parties holding interests acquired under the Program, the public interest favored issuance of the injunction, since "denying the motion could ruin some of the country's great environmental resources—and not just for now but for generations to come." Dec. 4th Order at 21.

Mountain States argues that the district court failed to weigh all of the applicable public interest considerations set out in FLPMA's policy statements, particularly the Act's directive that all BLM lands be managed to provide for multiple use and sustained yield, with some emphasis on the importance of developing natural resources. *See* 43 U.S.C. §§ 1701(a)(7), (12). Introduction of Mountain States' "missing" considerations, however, does not change the balance of interests. The interests that Mountain States claims are missing are

accounted for by FLPMA itself, and it is FLPMA which guided the court's determination that the public interest favors the granting of the preliminary injunction. FLPMA created a scheme whereby BLM's management of public lands would be subject to specified procedures that mandate consideration of numerous factors. Thus, if BLM is violating those procedures, its revocations and terminations may not represent the proper balance of competing uses of public land. Contrary to Mountain States' suggestion, the district court is not proclaiming that mining and mineral exploration is always bad or that retention of pristine public lands is necessarily good. Nor does the court's order prevent multiple use of the affected lands. The injunction simply preserves the multiple uses structured before the Department started reordering the scheme. We cannot find that the district court abused its discretion in this regard.

## CONCLUSION

This is a serious case with serious implications. The Department has reordered the balance of public versus private interests with respect to 180 million acres of federal land. Prompted by the Federation's charges that the Department's land status changes violate the agency's organic statute, the district court has stopped the Department midstream. Not surprisingly, the Department and private parties with an interest in preserving and furthering the Department's actions have mounted attacks on every front in order to defeat the Federation's advance at this preliminary stage of the battle. Some of their jabs are not without force. Nevertheless, we conclude, for the reasons stated above, that the district court acted well within its sound discretion, and we therefore sustain the preliminary injunction issued by the court. The district court's order is

*Affirmed.*

WILLIAMS, Circuit Judge, concurring and dissenting:

The majority today upholds a district judge's self-appointment as *de facto* Secretary of the Interior over 180 million acres—nearly one-fourth of all federal lands and more than half of the public lands managed by the Bureau of Land Management ("BLM"). It does so without a showing that the BLM breached any legal requirement as to a single parcel of land. Even assuming such a breach, the record is barren of any hint that it was material or likely to harm plaintiffs' interests—much less irreparably. Unable to sanction such a judicial usurpation of power, I dissent.

Part I addresses various procedural problems, Part II the merits of the preliminary injunction.

## I. PROCEDURAL MATTERS

### A. *Standing*

At this point in the proceeding the issue of standing is largely academic. The district court found that Congressman Sieberling had standing and did not consider that of the National Wildlife Federation ("NWF"). It marched on with the injunction proceedings that resulted in this appeal. During this process, a record developed that supplemented the vague allegations appearing in NWF's complaint. By the time the case was submitted to this court, the defendants appear to have conceded the bare minimum necessary for standing.

I write separately on this issue in the hopes of clarifying what a plaintiff must show to meet the injury-in-fact component of standing when it seeks a preliminary injunction. The gaps that lingered for some time in this record appear to have been quite unnecessary.

NWF challenges the legality of two programs—classification terminations and withdrawal revocations—that together affect over 180 million acres of public lands. To bring this challenge NWF must show that each program has impaired, or seriously threatened to impair, its members' use and enjoyment of either the subject lands or neighboring ones. This requires that NWF (1) identify lands that are affected by each program; (2) demonstrate that third parties are likely to respond to the regula-

tory changes with development activities; and (3) identify activities of members in specific areas that would suffer an adverse impact from such third-party conduct. *See, e.g., Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973); *Wilderness Society v. Griles,* 824 F.2d 4, 10–12 (D.C.Cir.1987).

The specificity required on each of these points is of course a function of the posture of the case. *SCRAP,* 412 U.S. at 689–90 & n. 15, 93 S.Ct. at 2417 n. 15; *Wilderness Society,* 824 F.2d at 16. In *Wilderness Society,* we explained that "while a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an opportunity for a supplementation of the record, and accordingly a greater showing is demanded of the plaintiff." *Id.* We also noted that plaintiff's opportunity for discovery in resisting summary judgment supported insistence on greater specificity at that stage. *Id.* at 16 n. 10.

Both *Wilderness Society* factors—opportunities to supplement the record and to engage in discovery—will normally be present where plaintiff seeks a preliminary injunction.[1] Moreover, plaintiff in this context must carry its affirmative burden of showing a likelihood of success on the merits; this necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing. It follows that the specificity required for standing allegations to secure a preliminary injunction will normally be no less than that required on a motion for summary judgment.

It is true that *SCRAP* involved motions to dismiss and for a preliminary injunction, *see* 412 U.S. at 689 n. 15, 93 S.Ct. at 2417 n. 15, and that the Court's standing analysis did not distinguish between the two, *see id.* at 683–90, 93 S.Ct. at 2413–17.

However, as the Court concluded that the district court completely lacked jurisdiction to issue an injunction, *id.* at 690, 93 S.Ct. at 2417, that silence is of little moment.

The Court's later decisions are at least congruent with the view that a preliminary injunction requires a more powerful showing. In *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), for example, the Court first found that a complaint against certain judicial officers alleging discrimination in criminal law enforcement and seeking injunctive relief failed to allege a case or controversy because of the speculative character of the injury foreseen. *Id.* at 493–99, 94 S.Ct. at 675–77. It then observed that the same considerations "obviously shade into those determining whether the complaint states a sound basis for equitable relief," *id.* at 499, 94 S.Ct. at 677, and analyzed the complaint under traditional equitable principles—irreparable injury and adequacy of the remedy at law. *See also Allen v. Wright,* 468 U.S. 737, 760–61, 104 S.Ct. 3315, 3329, 82 L.Ed.2d 556 (1984); *City of Los Angeles v. Lyons,* 461 U.S. 95, 103, 103 S.Ct. 1660, 1665–66, 75 L.Ed.2d 675 (1983).

The exact degree of specificity required of a plaintiff depends, to be sure, on the nature of its claim and the exigencies of the situation. Thus, where a preliminary injunction was needed simply to *preserve* files claimed by plaintiffs to substantiate their claims, the court imposed only a modest burden on them. *Palmer v. City of Chicago,* 755 F.2d 560, 573 (7th Cir.1985). *See Wilderness Society,* 824 F.2d at 16–17 & n. 10 (on motion for dismissal for want of jurisdiction, Fed.R.Civ.P. 12(b)(1), or motion for summary judgment, court must give plaintiff chance to discover evidence relevant to jurisdiction). And of course if facts relating to standing are put in issue, the court must address those conflicts. *See SCRAP,* 412 U.S. at 689, 93 S.Ct. at 2416 ("the allegations must be true and capable of proof at trial"); *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) ("it is within the trial

---

**1.** *But see infra,* for discussion of *Palmer v. City of Chicago,* 755 F.2d 560 (7th Cir.1985),

and the problem of special exigencies limiting those opportunities.

court's power ... to require the plaintiff to supply ... further particularized allegations of fact deemed supportive of plaintiff's standing"). Here, NWF has direct access to the evidence necessary to flesh out its claim of standing. Thus it is appropriate for the court to insist on allegations indicating specifically that defendant's acts are likely to lead to third-party conduct, in specific places, such as to injure plaintiff's members in their use of specific lands.

NWF's submissions were adequate on the identity of the lands affected by the regulatory status changes. Its complaint cites the passages in the Federal Register that affected the challenged classification terminations and withdrawal revocations; these passages identified the lands by legal descriptions. Complaint, Joint Appendix ("J.A.") at 15–16; Exhibit A, J.A. at 30–47 (citing notice given in Federal Register of each such act). *Compare Wilderness Society*, 824 F.2d at 12 (plaintiffs' claim of standing fails because affected lands not identified).

As to the other elements, NWF's submissions were markedly defective. Its complaint alleges that "[m]embers of NWF use and enjoy the environmental resources that will be adversely affected by the challenged actions." Complaint, J.A. at 15. This is too vague. The defect is similar to that in *Wilderness Society*, though not identical. There plaintiffs alleged use of federal lands throughout Alaska, and claimed impairment through transfer of federal lands to the state. We responded that the lands affected by the challenged policy might not overlap with those used by plaintiffs, 824 F.2d at 15, and said that the "absence of specificity regarding location dooms plaintiffs' claim of threatened injury." *Id.* Obviously the requirement of specificity cannot be met by plaintiffs' simply using broadened allegations (asserting use of "the environmental resources" rather than "various" lands, as in *Wilderness Society*).

After the injunction issued, NWF attempted to "further particularize[ ]" its allegations by submitting the affidavits of two of its members. *Cf. Warth v. Seldin,*

422 U.S. at 501, 95 S.Ct. at 2206. The affidavits themselves are still too vague. They merely state that the affiant uses "the federal lands, including those in the vicinity of [the South Pass–Green Mountain area of Wyoming (for one affiant), and the Grand Canyon National Park, the Arizona Strip (Kanab Plateau), and the Kaibab National Forest (for the other affiant) ] for recreational purposes and for aesthetic enjoyment." J.A. at 372, 376. While a court conceivably could match the legal descriptions in the Federal Register with these broad stretches of land, it has neither the legal obligation nor the resources to do so.

Further, NWF's complaint alleges, again in the most general terms, that private parties will avail themselves of the withdrawal revocations and classification terminations to develop the lands in a manner incompatible with its members' uses. The affidavits are only slightly more specific, alleging that the lands used by the affiant (or lands in their vicinity) have been "opened to the staking of mining claims," J.A. at 373, 377, or to oil and gas leasing, J.A. at 373. They do not trace the opening of the lands to either of the two challenged programs, do not assert (much less substantiate) that the "opening" was likely to lead to mining or oil or gas development, and do not specify how such activity would interfere with their uses.

The record, however, provides modest support for the inference that some types of the disputed regulatory status changes have a material likelihood of leading to development activity potentially injurious to the activities of plaintiff's members on the lands named in the affidavits. BLM data show that withdrawal revocations have opened over 12 million acres to mining, and classification terminations over 800,000 acres. These resulted in the filing of about 7,000 claims and the filing of plans for operations with respect to 540 acres. *See* J.A. at 64–70, 94–96. 540 acres worth of activity is not much, out of 180,-000,000 acres, but, bearing in mind that *threatened* environmental damage is also a ground of standing, it seems minimally sufficient. Combined with the concession at oral argument that some of the acreage

opened to mining was in the vicinity of lands used by one of plaintiff's members in Arizona,[2] this seems to me to minimally meet the standing requirement.

## B. *Exhaustion*

In a motion to reconsider the district court's order granting a preliminary injunction, Mountain States Legal Foundation, a public interest law firm that intervened on the side of the defendants, raised the question of whether plaintiff exhausted available remedies as to the classification terminations. It raised no such claim as to the withdrawal revocations, without explanation. The government defendants make no exhaustion claim at all. The district court rejected the defense. I believe this was an abuse of discretion.

First, the silence of the government defendants might be deemed a waiver. But that appears consistent neither with the principles of exhaustion nor with circuit law. The exhaustion requirement serves not only interests of agency autonomy but also interests of the courts:

> Exhaustion generally is required as a matter of preventing premature interference with agency processes, so that [1] the agency may function efficiently and [2] so that it may have an opportunity [a] to correct its own errors, [b] to afford the parties and the courts the benefits of its experience and expertise, and [c] to compile a record which is adequate for judicial review.

*Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975). The considerations in the second group plainly bear on important concerns of judicial economy. Government neglect cannot force courts to disregard those concerns.

Indeed, this court has not regarded an agency's failure to invoke the exhaustion defense as a binding waiver. In *Asarco, Inc. v. EPA*, 578 F.2d 319, 320–21 n. 1 (D.C.Cir.1978), one petitioner raised an argument that another claim had not been made in the administrative proceedings. The court said that indeed the argument had been made, but set out alternative grounds for treating the merits. First, it read the EPA's silence on the issue as evidence that EPA saw no harm to its institutional interests:

> First, EPA itself did not move for dismissal on grounds of exhaustion or join in intervenors' motion. The agency's failure to insist upon exhaustion in this particular case suggests that, in EPA's view, the costs—in terms of interfering with agency proceedings, creating an incentive to ignore agency processes in the future, and depriving the agency of a greater opportunity to apply its expertise or of a chance to "correct its own errors" —do not outweigh the benefits of this court's immediate consideration of Sierra's petition. *See* K. Davis, Administrative Law of the Seventies § 20.00 (1977 Supp.); *cf. Weinberger v. Salfi*, 422 U.S. 749, 764–67, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

*Id.* The court then invoked two additional factors in support of dispensing with the requirement: first, the issues were purely ones of law, not requiring "a record of fact-finding developed by an agency with special expertise"; second, as other parties had raised "essentially the same question," it was appropriate to consider both at the same time. *Id.* Obviously the court regarded agency silence as something to be considered, but not a dispositive factor. *Cf. Granberry v. Greer*, — U.S. —, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987) (in habeas action by state prisoner, state's failure to raise exhaustion defense in federal district court does not bar court of appeals from dismissing for want of exhaustion; but failure to exhaust is not jurisdictional).

Given the discretionary character of the exhaustion defense, this court may only reverse if it finds that the district court's disposition of the issue was an abuse of

---

**2.** Counsel for Mountain States acknowledged status changes relating to lands described by the Wyoming NWF member, but stated that these merely opened to mining claims areas not containing minerals of more than nominal value.

*See* p. 334 *infra* for discussion of classification terminations based on lack of mineral interest. For such areas, the likelihood of private development activity seems too remote to meet the *Wilderness Society* standard.

discretion. *Hayes v. Secretary of Defense*, 515 F.2d 668, 674–75 (D.C.Cir.1975); *Industrial Workers of the World v. Clark*, 385 F.2d 687, 692 (D.C.Cir.1967), *cert. denied*, 390 U.S. 948, 88 S.Ct. 1036, 19 L.Ed.2d 1138 (1968); *Southeast Alaska Conservation Council v. Watson*, 697 F.2d 1305, 1309 (9th Cir.1983).

In rejecting the exhaustion defense, the district court characterized the issues in this case as purely "legal." J.A. at 169. As my substantive analysis should make clear, that characterization simply neglects the core issue in the case: whether the land use plans used by the BLM in terminating classifications failed in any material way to live up to the standards imposed by the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.* (1982). Had plaintiff sought review in the Board of Land Appeals, the Board would have compared the land use plans actually relied upon by the BLM (discussed below at pp. 19–20), and evaluated them for compliance with FLPMA § 202(d), 43 U.S.C. § 1712(d), the provision here alleged to have been violated. If it found any deficiencies in the plans, it would presumably have considered whether correction of any of those deficiencies would have any prospect of affecting the planning outcome; in so doing it would have assessed the potential impact on the substantive values involved, including plaintiff's environmental interests. Thus the issues that would have been before the Board (and are now before us) seem to me as fact-rich as one can imagine. This case implicates, as strongly as possible, the values of allowing the agency to correct possible errors, to employ its expertise, and to build an intelligible record for judicial review.

The district court also found that the department regulation permitting review of BLM decisions by the Interior Board of Land Appeals did not open the door to one in plaintiff's position. It reads:

(a) Any party to a case who is adversely affected by a decision of an officer of the Bureau of Land Management or of an administrative law judge shall have a right to appeal to the Board....

43 C.F.R. § 4.410(a) (1986). *See* J.A. at 167.

Plaintiff had not been a "party" to a "case" before the BLM. But at least where there has been no formal adjudication before the BLM, the Board appears not to insist on any particular kind of participation before the agency. For example, in *Desert Survivors*, 80 IBLA 111 (1984), the Board said plainly, "As one adversely affected by a BLM decision on a protest, appellant is a party to the case." *Id.* at 113. It went on to note that appellant had been an active participant in the planning of the Wilderness Study area in question and the development of the mining plan at issue; but it in no way suggested that this was a requirement of standing. While the Board might conceivably limit appeal to participants below, *Desert Survivors* hardly stands for the proposition that it now does so. Even if it did, plaintiff itself claims to have corresponded on these matters with high-level officials within the Department for over a year, Brief for Appellee at 56, and offers no reason to believe that such involvement would not meet whatever precondition might possibly be inferred from *Desert Survivors*.

The only other decision to which anyone has called our attention, *Park County Resource Council, Inc. v. Department of Agriculture*, 613 F.Supp. 1182 (D.Wyo. 1985), *aff'd on other grounds*, 817 F.2d 609 (10th Cir.1987), appears of marginal relevance. Plaintiffs sought review of challenges to the BLM's issuance of (1) an oil and gas *lease* and (2) a drilling *permit.* The district court applied the doctrine of exhaustion to the lease dispute, as plaintiff had never sought IBLA review. This obviously reflected the court's assumption that IBLA review was available. As the point was evidently not argued, and we have no information about plaintiffs' participation before the BLM, the court's assumption sheds no light on the proper construction of § 4.410(a). On appeal, the Court of Appeals for the 10th Circuit rejected the district court's application of exhaustion to the lease dispute, on a variety of grounds. Insofar as it found IBLA unavailable as an administrative avenue of redress, it did so

*only* on the grounds that the time limit had run. 817 F.2d at 619. I do not take the majority here to be adopting the view that exhaustion is excused whenever parties let the time for administrative review expire, a proposition as novel as it would be destructive.

Finally, the district court believed that exhaustion would be futile, that the record showed the department irreversibly committed to its view of the law. J.A. at 169. But departmental commitment to a particular view of the law would not show futility at all: administrative proceedings focused on the actual decisions and tracts would undoubtedly have clarified the *relation* between facts and law, the critical element in this case.

Accordingly, I believe the district court abused its discretion in rejecting the exhaustion defense.

## C. *Indispensable parties*

Federal Rule of Civil Procedure 19 orders the joinder of certain parties where it is feasible to do so, and it appears to be assumed on all hands that this standard is met by the holders of certain types of property interests on the public lands affected by this litigation: those whose titles (perfected or inchoate) depend upon terminations or revocations made since January 1, 1981. Such parties' interests are directly affected by the district court's preliminary injunction (in its ultimate form), for it bars the defendants from taking any administrative action dependent on such terminations or revocations, "including, but not limited to" granting of rights-of-way or approval of plans of operations. Thus, for example, the holder of a mineral lease will not be able to secure approval of any application for a permit to drill; without the permit, of course, he cannot make his lease productive. Similarly, a holder of mining claims will not be able to secure approval of plans of operations, which is required for operations involving five or more acres, *see* 43 C.F.R. § 3809.1–4 (1986); this disability condemns such claims at least temporarily to barrenness.

When such parties are identified under Rule 19(a) and cannot be joined, Rule 19(b) requires the court to consider four factors in choosing whether the litigation should proceed or be dismissed:

The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

The district court proceeded through the required analysis, finding the balance to tilt in favor of permitting the suit to continue. Courts of appeals typically review such findings under an "abuse of discretion" standard. *See Northern Alaska Environmental Center v. Hodel*, 803 F.2d 466, 468 (9th Cir.1986); *Pulitzer–Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir.1986); *Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70, 75 (2d Cir.1984). Here I believe there has been no abuse.

The district court understandably stressed item four—the difficulties that plaintiff would encounter if unable to proceed here. J.A. at 147–48. If application of Rule 19 to this situation generated the principle that the administrative challenge could not proceed in the absence of such property owners, then plaintiff could secure adjudication only by bringing separate suits in each of the 17 states where federal land has been affected by the asserted administrative delinquencies. Normally 17 suits would not seem a hopelessly large number for litigation affecting 180 million acres of land. Each lawsuit would apply on average to more than 10 million acres, which for most of us is quite a lot. Nonetheless, it would entail a multiplication of the litigation, perhaps for little advantage.

On the other hand, the district court squarely confronted the difficulties that

non-participation could inflict on the absentees. By forcing the defendants automatically to deny approval of plans of operations, the injunction denies mining claimants exclusive possessory rights to which they are otherwise entitled by law, 30 U.S.C. § 26 (1982). It erects similar barriers to mineral lessees. (The majority's suggestion that the "right [of holders of such property interests] to use and enjoyment of that property is not affected by the court's order," Maj. at 315, is simply incorrect. *And see Sierra Club v. Peterson,* 717 F.2d 1409, 1414 (D.C.Cir.1983) (under usual mineral lease Interior has no absolute right to preclude development).) Further, the court noted that as only the absent parties could measure the value of their interests and the effect of the prospective impairments, the presence of defendants and intervenor Mountain States Legal Foundation was not a complete substitute for their own direct involvement. J.A. at 146–47.

Nevertheless, seeing little impact from the other two Rule 19 factors—the risk that a judgment rendered in the absence of the omitted parties might not afford plaintiff adequate relief and the court's ability to reduce the prejudice to absentees by the shaping of relief—the court found dismissal unsuitable.

Of course under the Due Process clause of the Fifth Amendment persons normally cannot be bound by litigation to which they were not parties or privies. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party nor a privy and therefore has never had an opportunity to be heard"); *Hansberry v. Lee,* 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940). We may assume, then, that the absentees are not legally bound by this adjudication. Yet their interests are severely affected, in the ways acknowledged by the trial court.

In considering whether this outcome is acceptable under Rule 19 and the Due Process clause, the remedies available to the absentees are surely relevant. Assuming that they are not legally bound, I take it

that, for example, a mineral lessee that was denied a drilling permit to which it would otherwise be entitled could seek judicial relief against the BLM. A federal court outside this district would not be bound by the decision in the trial court or here, and, if it viewed the law differently, might order relief. In addition, such parties could protect their interests—at some expense—by intervening in the litigation here. (Their interest in the *stare decisis* effect of this litigation would likely entitle them to intervention as of right under Fed. R.Civ.P. 24(a)(2); *see Nuesse v. Camp,* 385 F.2d 694, 701–02 (D.C.Cir.1967); *Atlantis Development Corp. v. United States,* 379 F.2d 818 (5th Cir.1967).)

Moreover, administrative litigation commonly inflicts drastic effects on absent third parties. Perhaps the most radical example is that culminating in *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), imposing federal price controls on independent gas producers' wellhead sales of gas into the interstate market. Legal interpretations emerging from such proceedings are legitimized (we hope) by the crucible of litigation —the presence of parties motivated to present a neutral court with the most persuasive arguments. Though the parties here are not complete substitutes for the absent ones, as the district court acknowledged, the potential unfairness seems in accord with what we often tolerate.

## II. THE PRELIMINARY INJUNCTION

As relevant here, NWF has challenged (1) the Secretary's termination of classifications—covering 160.8 million acres of federal land—without legally sufficient "land use plans" and (2) the Secretary's revocation of withdrawals—affecting 20 million acres—without adequate public participation. In order to prevent these actions from leading to shifts in the character of the lands until its claims are adjudicated, NWF sought and obtained a preliminary injunction staying the effects of the Secretary's actions.

"It goes without saying that an injunction is an equitable remedy. It 'is not a

remedy which issues as of course.'" *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 1802, 72 L.Ed.2d 91 (1982) (citation omitted). A party seeking a preliminary injunction must prove that the balance of four elements favors such relief:

> (1) the plaintiff's likelihood of success on the merits; (2) the threat of irreparable injury to the plaintiff absent the injunction; (3) the possibility of substantial harm to other parties caused by issuance of the injunction; and (4) the public interest.

Maj. at 318 (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312–13, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977)). I believe that NWF fails this test.

A. *Classification Terminations*

NWF maintains that the Secretary has violated § 202 of FLPMA, 43 U.S.C. § 1712 (1982), by terminating land classifications on 160.8 million acres of federal lands without adequate land use planning. The Secretary has terminated a classification order only if it fell within one of four categories:

> a. The order does not include any segregative language, e.g., merely "classified for retention," since the retention-disposition issue was resolved by Section 102 of FLPMA.
>
> b. The order segregates against applications under laws which were repealed by FLPMA.

> c. The order segregates against discretionary land laws ... and a Management Framework Plan (MFP), Resources Management Plan (RMP), or special area plan ... is in place and provides an adequate basis for acting on applications which may be filed under those laws.
>
> d. The order segregates against operation of the mining laws, but the lands involved do not contain minerals of more than nominal value, ... and there has been no serious interest expressed in mineral development.

Organic Act Directive No. 81–11, at 2 (June 18, 1981), J.A. at 97–B.

It seems highly unlikely that the reclassifications falling in categories (a), (b) or (d) would result in any new entry, development or disposal. Indeed, NWF makes no such claim. Rather, it focuses its attack on a subset of category (c) reclassifications—those based on MFPs, a designation used by the BLM for plans prepared *before* the adoption of FLPMA. (There is no revelation by the district court why the injunction should address reclassifications under (a), (b) or (d).)

Section 202(d) provides that "[t]he Secretary *may* modify or terminate any [land] classification consistent with ... land use plans" that have been "developed pursuant to this section." 43 U.S.C. § 1712(d) (1982) (emphasis added). Section 202(c) enumerates nine criteria for the development of plans [3] and § 202(f) requires the Secretary

---

**3.** Section 202(c) provides as follows:

> (1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;
>
> (2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;
>
> (3) give priority to the designation and protection of areas of critical environmental concern;
>
> (4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;
>
> (5) consider present and potential uses of the public lands;
>
> (6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;

> (7) weigh long-term benefits to the public against short-term benefits;
>
> (8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; and
>
> (9) to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located, including, but not limited to, the statewide outdoor recreation plans developed under the Act of September 3, 1964 (78 Stat. 897), as amended [16 U.S.C.A. § 4601–4 et seq.], and of or for Indian tribes by, among other things, considering the policies of ap-

to provide an opportunity for public involvement. 43 U.S.C. §§ 1712(c), (f). Since MFPs by definition antedate FLPMA, NWF argues that they have necessarily not been "developed pursuant to this section [§ 202]," and accordingly do not provide a legal basis for reclassification. *See* Brief for Appellee at 27–30.

NWF's theory builds, of course, entirely on a negative pregnant: from the authorization of classification decisions based on § 202 plans, it infers an absence of authority to make such decisions without them. In fact the full context of § 202 militates against drawing such an inference in the rigid form required for NWF to prevail.

In enacting FLPMA, Congress made clear not only its familiarity with the BLM's land use planning procedures, but its approval. It seems fair to infer that Congress contemplated reliance on pre-FLPMA plans when they substantially conformed to the process specified in § 202, at least for some time.

FLPMA arose in large part out of the Report of the Public Land Law Review Commission, *One Third of the Nation's Land* (1970), which specifically appraised the quality of land-use planning by the BLM. Far from finding the existing practices defective, it appeared to regard them as deserving codification. First the authors described the process:

> BLM's recent [land use planning] efforts appear to require consideration of the following general categories of factors in varying degrees: physical and locational suitability of the lands or resources for obvious purposes; supply of resources and demand for resource products; communities and users dependent on the public lands and resources; environmental factors; impact on state and local governments; efficiency of resource use and sustained yield of renewable resources; and regional economic growth.

*Id.* at 46. Then it commended them and proposed their use by Congress as at least the foundation of a codified scheme for land-use planning:

> We have profited by this implementation of the Classification and Multiple Use Act and endorse the general planning approach embodied in that system. It is now time for Congress to rely on this experience by establishing legislatively those factors that should be considered in all Federal land use planning. The factors identified in the preceding paragraph provide an adequate starting point.

*Id.*

The elements identified in the first paragraph clearly correspond to a large degree with those specified in § 202. Congress apparently accepted the Commission's favorable judgment. The House Committee Report observed:

> The Committee is well acquainted with the land use planning systems of the Bureau of Land Management and the Forest Service and has found them to be consistent in general principles and practices with the objectives of H.R. 13777.

H.R.Rep. No. 94–1163, 94th Cong., 2d Sess. 5 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 6175, 6179.

The legislative history thus suggests two points: First, as the statutory mandate for

---

proved State and tribal land resource management programs. In implementing this directive, the Secretary shall, to the extent he finds practical, keep apprised of State, local, and tribal land use plans; assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use

decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands. Such officials in each State are authorized to furnish advice to the Secretary with respect to the development and revision of land use plans, land use guidelines, land use rules, and land use regulations for the public lands within such State and with respect to such other land use matters as may be referred to them by him. Land use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act.

§ 202 plans was derived from BLM practice, there is every reason to suppose that pre-FLPMA plans, or at least many of them, would substantially correspond to the statutory requirement. Second, in view of that congruence, Congress is likely to have expected that the BLM would employ MFPs rather than, in every case, re-invent the wheel. The district court in fact acknowledged that the "MFP's [sic] may confirm [sic] to the general principles of the FLPMA," but then asserted that "they are not identical substitutes to RMP's [sic] [post-FLPMA plans developed in explicit effort to comply therewith]. The land use plans Congress envisioned would modify existing plans in several aspects, including public participation." J.A. at 153. Though obscure, the record here suggests that the MFPs used to effect reclassifications did conform to the requirements of § 202, most particularly including public participation.

The Department of Interior has promulgated regulations allowing the BLM to rely on an MFP to terminate a classification only if the MFP meets criteria closely paralleling those of § 202. Under 43 C.F.R. § 1610.8(a)(1) (1986), MFPs can support reclassifications only where they [1] "shall have been developed with public participation and governmental coordination...." and [2] "shall be in compliance with the principle of multiple use and sustained yield." Assuming that Interior has adhered to this regulation (and there are no claims of non-adherence), the first criterion assures that none of the terminations here at issue can have violated § 202 in the single aspect specified by the district court as a potential discrepancy (and the feature most stressed by plaintiff). Moreover, the second criterion—planning in accordance with multiple use, sustained yield principles—is not only the first requirement of § 202(c), but is likely to entail compliance with the other features of its list, e.g., protecting critical environmental areas, inventorying potential resources, considering present and potential uses, considering relative scarcity of the different values involved, and weighing long-term against short-term benefits. Thus the likelihood is very great that the relevant MFPs substantially comply with § 202.

Apart from the implications from 43 C.F.R. § 1610.8(a)(1), the record is a complete blank. We do not know whether any of the plans fell short of other criteria in any significant respect—or in any insignificant one, for that matter. Not a single MFP was before the court. Not one is before us now. This is a novelty: adjudication in a vacuum. None of the judges in this proceeding—neither the district court, the majority, nor I—has any basis for concluding that the MFPs relied on do not mirror RMPs in all substantive respects.

FLPMA and its context support the view that substantial compliance with § 202 should suffice for some time after enactment. Congress explicitly recognized that § 202 land use plans would not come into existence overnight; in a general provision on supervision of the public lands, it directed the Secretary to manage them pursuant to such plans "when they are available." 43 U.S.C. § 1732(a). Of course this general clause could co-exist with congressional insistence on 100% pure § 202 plans for classification decisions, but it surely counsels against finding a highly restrictive negative pregnant in § 202(d). A comparison of FLPMA with Congress's 1976 amendments to the Forest and Rangeland Renewable Resources Act of 1974, adopted the day after FLPMA, also militates against such an absolutist view. There Congress directed the Secretary of Agriculture to "attempt to complete" the upgrading of national forest planning by September 30, 1985. See 16 U.S.C. § 1604(c) (1982). Congress not only "knew how" to impose a deadline, as the saying goes, but when it did so in a parallel instance on almost the same day, it allowed nearly a decade and even at that required only an "attempt."

The district court recognized that the statute contemplated "temporary" reliance on MFPs, but concluded that the BLM had exceeded the limits of this tolerance. J.A. at 153.[4] Therefore it concluded that NWF was substantially likely to prevail on the

---

4. The majority appears to repudiate that concession of the district court. Maj. at 321.

merits of its claim. The district court did not explain its apparent belief that reliance on MFPs should become unlawful at some specific date—regardless of how closely the MFPs conformed to the substance of § 202.

These considerations carry still worse implications for plaintiff when we turn to the issue of irreparable harm. Harm for such purposes is of course defined in terms of the evil that the particular statute was designed to prevent. Thus, in *Amoco Production Co. v. Village of Gambell,* —— U.S. ——, 107 S.Ct. 1396, 1403, 94 L.Ed.2d 542 (1987), the defendants had neglected to hold certain hearings and to make certain findings. The Court (assuming the applicability of the requirements and their violation) held that an injunction was improper, in light of district court findings that the conduct enjoined would not adversely affect "subsistence uses" of land, the statutorily protected value. *Id.* at 1403–04. The court below, it observed, "erroneously focused on the statutory procedure rather than on the underlying substantive policy." *Id.* at 1403. *See also Weinberger v. Romero–Barcelo,* 456 U.S. at 314, 102 S.Ct. at 1804.

Here, even if we assume illegality under § 202, the district court had no basis for finding that such illegality would likely generate an adverse effect on the values implemented by § 202. That section manifests an intent that the public lands be managed in accordance with a planning approach that balances the many potential values to which they may be put and that allows public participation in that process. *See* note 3, *supra.* As the district court did not review a single MFP, plainly it was in no position to find that any fell materially short of fulfilling those purposes. What little we know suggests that there was no such shortfall. *Cf. Natural Resources Defense Council, Inc. v. Hodel,* 624 F.Supp. 1045 (D.Nev.1985) (reviewing and upholding MFP relied on by BLM after December 1982 for livestock grazing decision), *aff'd,* 819 F.2d 927 (9th Cir.1987). Moreover, it may well be that the bulk of the developmental activities restricted by the preliminary injunction would occur (if not blocked) on lands so barren and so distant from areas of potential recreation that they could not jeopardize plaintiff's recreational interests.

Offsetting this doubtful threat to plaintiff's interests is the obvious effect on the absent holders of interests dependent upon the challenged terminations. For commercial interest holders, an investment is tied up for an indefinite period, all chance of any return denied. *Cf. First English Evangelical Lutheran Church v. County of Los Angeles,* —— U.S. ——, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Further, and bizarrely, the preliminary injunction is now preventing land exchanges of such an obviously benign character that even *plaintiff* favors them. NWF sought to voluntarily dismiss its claim as to a tract slated for exchange by the Forest Service, under which it would give up interests already developed for vacation resort purposes and would secure the one remaining private inholding in an area proposed for Wild and Scenic River study status. *See* Excerpt of Record for a Writ of Prohibition ("E.R.") 180–84. The district court, however, hewed to its absolutist view of the law and denied relief. *See* E.R. 260. The preliminary injunction has also blocked a similar exchange between the Forest Service and the Trust for Public Land. *See* E.R. 175–79. At no point has the district court made any inquiry into the intersection of plaintiff's and the absentees' claims—*i.e.,* what areas of potential recreation are potentially threatened by the absentees' efforts to exercise their entitlements or to proceed with planned transactions.

Finally, the public interest does nothing to tilt the balance in favor of the injunction issued. Congress has manifested a deep interest in environmental concerns, but it has also shown an intention to allow reasonable development of mineral resources on the public lands. *See* 30 U.S.C. § 21(a) (1982) (it is the "continuing policy of the Federal Government ... to foster and encourage private enterprise in ... the development of economically sound and stable domestic mining ... [and] mineral reclamation industries, [and in] the orderly and

economic development of domestic mineral resources ... to help assure satisfaction of industrial, security and environmental needs"); 43 U.S.C. § 1701(a)(12) (1982) (announcing policy that "public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals"); *National Coal Association v. Hodel*, 825 F.2d 523, 529–30 & n. 8 (D.C.Cir. 1987). Both interests are of great value; but in issuing the preliminary injunction the district court has made no effort to make marginal adjustments: to identify those areas where environmental interests are in real jeopardy from substantive administrative lapses from congressional mandated duties. The denial of relief even for exchanges favored by all parties appears to manifest a legalistic zeal quite inconsistent with the balancing that is required for preliminary injunctions.

Accordingly, there is no basis for the sweeping injunction here issued, halting all steps that the Secretary might take that depend on the challenged terminations.

## B. *Withdrawal Revocations*

Since the passage of FLPMA, the Secretary has issued 671 public land orders revoking withdrawals affecting nearly 20 million acres. J.A. at 61. NWF contends that these actions are illegal because the Secretary failed to provide the public an opportunity to participate in each withdrawal revocation, in violation of FLPMA § 309(e), 43 U.S.C. § 1739(e). That section provides:

> In exercising his authorities under this Act, the Secretary, by regulation, shall establish procedures, including public hearings where appropriate, to give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands.

The district court found it likely that these limitations applied to the withdrawal revocations. J.A. at 155.

The Secretary argues that § 309(e) is intended to be precatory only, and in the alternative that it covers *planning* only.

The relation of § 309(e) to FLPMA as a whole lends some support to the Secretary's view of it as precatory. Section 309(e) is the last subsection of a section providing for the creation and use of citizen advisory councils. That section is in turn the last provision in subchapter III, governing "Administration." At various points along the way, FLPMA provides explicitly for public participation. Thus, § 204(h) requires a public hearing for new withdrawals. § 204(*l*) requires, for a special class of revocations, an elaborate, multi-stage review by the President and Congress; beside the requirements of § 204(*l*), the references in § 309(e) to giving "the Federal government" notice and opportunity to comment appear rather pale. Finally, as noted above, § 202(f) requires public participation in the land-use planning process. The location in a general administrative provision, the generality of language, and the presence of specific mandates elsewhere make it at least plausible to suppose that Congress intended § 309(e) only as an exhortation.

It seems fair to regard § 309(e)'s character as at best ambiguous. Thus under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Secretary's reading of it as precatory is entitled to deference so long as it is a reasonable one. I believe it passes that test.

The defendants' alternative argument, limiting § 309(e) to planning activities, has some support in the legislative history,[5] but seems less plausible. Congress had, after all, explicitly required public participation in the planning process in § 202(f), so that

---

5. Such history focuses generally on the value of public participation in planning, *see, e.g., One Third of the Nation's Land* 57 (Recommendation 11); H.R.Rep. No. 94–1163, 94th Cong., 2d Sess. 7 (1976), U.S.Code Cong. & Admin.News 1976, p. 6181 (commentary on draft section that emerged as § 202(f)); *but see* S.Rep. No. 94–583, 94th Cong., 1st Sess. 106–07 (1975) (correspondence arguably supporting application of § 309(e) to "management" decisions other than planning).

renewal of the mandate in § 309(e) would be oddly duplicatory. In asserting the planning-only theory, however, the Secretary points to various mechanisms by which the public is brought into decisions *executing* the plans. Although the Secretary does not frame the argument as one of substantial compliance, his contentions inevitably suggest such a finding. If there is an opportunity for public participation in the BLM's exercises of *material discretion* down the line from planning, it is hard to classify its failure to provide automatically for public participation in withdrawal revocations as a material breach of § 309(e), even assuming it to be mandatory and to encompass individual "management" decisions.

Indeed, key decisions by which the government may shift title to private parties, or otherwise permit development activities, appear to be governed by regulations giving the public a role. The Secretary notes, for example, department regulations requiring the BLM to give public notice before making a land exchange, 43 C.F.R. § 2201.1(a) (1986) (notice to be provided through the Federal Register and local newspapers, and to be sent directly to state and local officials, with a 45-day period for comment). *See also id.* § 2711.1-2 (1986) (similar, for sales); *id.* § 2802.4(d) & (e) (similar, for issuance of rights of way); *id.* § 2741.5(h) (similar, for grants under Recreation and Public Purposes Act, 43 U.S.C. § 869 *et seq.* (1982)).

The mining laws, however, particularly the Mining Act of 1872, 30 U.S.C. § 21 *et seq.* (1982), allow entry without BLM issuance of title. This might appear to create a gap. But regulations governing the environmental review process under the National Environmental Policy Act, 42 U.S. C. § 4321 *et seq.* (1982), appear to close it up. § 5.4B(8), Appendix 5 to Chapter 6, Part 516 of Departmental Manual, appears by implication to require an environmental assessment ("EA") or environmental impact statement ("EIS") where termination or revocation would open lands to mining laws and the lands contain minerals of

more than nominal value. 47 Fed.Reg. 50371 (Nov. 5, 1982); *see also* BLM Reply Brief at 17 (so construing § 5.4B(8)). *Cf. National Forest Preservation Group v. Butz,* 485 F.2d 408 (9th Cir.1973) (requiring a NEPA statement when the government enters an *exchange* under which private parties will acquire land on which they will engage in activities materially affecting the environment). Other regulations provide for public participation in the preparation of an EA or EIS. *See* 40 C.F.R. § 1501.4(b) (requiring involvement of the public "to the extent practicable" in preparing EAs); *id.* § 1503.1(a)(4) (providing for solicitation of public comment in preparation of an EIS). If the BLM follows these regulations as it construes them here, they assure public participation for precisely the withdrawal revocations that might jeopardize plaintiff's interests.

Moreover, even a nominal opening to entry under the mining laws preserves the department's opportunity to exercise discretion, together with a chance for the public to be heard. Departmental regulations require BLM approval for any mining operations disturbing more than five acres, 43 C.F.R. § 3809.1-4, and the approval process requires an EA, *id.* § 3809.2-1. If the EA indicates that there is "substantial public interest" in the proposed plan, the officer in charge must arrange for public notice and consideration of public comments. *Id.* § 3809.2-1(c).

Again the record on these matters is completely deficient. Although it appears to be conceded that the revocations expose some lands in the vicinity of areas used by plaintiff's members to the risk of development, *see* pp. 329–330 *supra,* there is no evidence suggesting that want of public participation in withdrawal revocation procedures played any material role in creating this risk. If, for example, these revocations followed EAs or EISs under § 5.4B(8) of the Departmental Manual, public notice and opportunity to comment presumably occurred—unless the expected environmental effects were modest.[6]

6. It seems inescapable that § 309(e), even if

mandatory, does not require public partic-

As in the case of classification terminations, the leap to irreparable injury is an athletic one. If the withdrawal revocations that might lead to actual mining activity were made after public notice and opportunity to comment under § 5.4B(8) of the Departmental Manual, then want of public participation formally linked to § 309(e) would be irrelevant. Similarly, if (1) a revocation occurred without public opportunity for participation, but (2) later discretionary decisions triggered public notice and opportunity to comment, and (3) in those proceedings the fact of revocation did not materially reduce the range of real-world considerations that members of the public could invoke (*i.e.*, considerations other than the technical existence of the withdrawal itself), there would be no harm from the omission. *See Amoco Production Co. v. Village of Gambell*, 107 S.Ct. at 1403. But none of this is explored. Plaintiff has chosen to paint with a very broad brush, and the district court has accommodated its program. I would remand for examination of these issues.[7]

Finally, the interests of third parties and the public interest work against the preliminary injunction as they did in the classification context. The injunction bars absentees from exercise of their rights, for an indefinite period; it makes no effort to minimize the *aggregate* harm to the public interests in both environmental preservation and alternative activities: the district court has allowed environmental interests, however weak and however trivially they

ipation in *every* management decision. For example, the Secretary's regulations permit persons to engage in mining activities disturbing an aggregate of five acres or less (including access) per year merely on notice to the Secretary and without his approval. 43 C.F.R. § 3809.1–3 (1986). This excludes the public, but is surely permissible if public participation is not to be insisted upon simply as a fetish.

7. In addition, certain of the revocations were subject to § 204(*l*), which requires the Secretary to review specified withdrawals within 15 years of FLPMA's enactment and to submit to the President a report giving his recommendations as to whether they should be continued. The President is to forward the report to Congress, along with his recommendations. The Secretary is free to terminate withdrawals only when 90 days have passed without Congress

may be at risk as to particular tracts, to sweep the other interests off the board.

Though concurring on the finding of standing and satisfaction of Rule 19, I dissent.

having exercised a legislative veto. The procedure is now obviously questionable under *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), as is the status of the Secretary's authority assuming invalidation of the legislative veto. *See Alaska Airlines, Inc. v. Brock*, —— U.S. ——, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (discussing the severability of statutes from their legislative veto provisions). I would remand for consideration of NWF's claim that the Secretary disregarded the § 204(*l*) process. Of course, my opinion on the claims under §§ 202(d) and 309(e) is only a dissent. Nonetheless, as the district court has not yet finally resolved the substantive claims, some attention to the § 204(*l*) claim may be in order in connection with that process if my reading of those sections has any merit.